**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ronald K. PETERSEN, Joel Lee Mitchell, Richard Igo, Dee Duncan, a/k/a Dee Duncan Mitchell, James Franklin Dixon, Joe Wilson, Robert Leonhardt, Aaron Keith Stevens, James Balloue, Jodie Stewart Malone, Richard Carlson, Johnny Miller, Defendants-Appellants.**

Nos. 78–1649 to 78–1660.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 10, 1979.

Decided Nov. 15, 1979.

Rehearing Denied in Nos. 78–1649, 78–1652 through 78–1659 Feb. 14, 1980.

Rod W. Snow, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., with him on the brief), for plaintiff-appellee U. S.

George W. Dixon of George W. Dixon, Inc., P.S., Tacoma, Wash., for defendant-appellant Ronald K. Petersen.

Sylvian R. Roybal of Martinez & Mendez, P.C., Denver, Colo., for defendant-appellant Jodie Stewart Malone.

Stephen A. Ware, Denver, Colo., for defendant-appellant Richard Carlson.

Wayne E. Griffin, Denver, Colo., for defendant-appellant Johnny Miller.

J. Terry Wiggins, Denver, Colo., for defendant-appellant Joe Wilson.

Harry L. Zimmerman, Dallas, Tex. (Donald G. Martin, Wichita Falls, Tex., with him on the brief), for defendant-appellant Dee Duncan a/k/a Dee Duncan Mitchell.

Donald G. Martin, Wichita Falls, Tex., for defendant-appellant Joel Lee Mitchell.

Gary J. Ceriani, Denver, Colo. (John B. Moorhead, Denver, Colo., with him on the brief), of Davis, Moorhead & Ceriani, P.C., Denver, Colo., for defendant-appellant James Franklin Dixon.

Robert T. Page, Denver, Colo., for defendant-appellant Richard Igo.

Richard D. Torpy, Denver, Colo., for defendant-appellant James Balloue.

Valentine W. Logan, Denver, Colo., for defendant-appellant Robert Leonhardt.

Jerry C. Connell of Bohm, Connell & McLellan, Lakewood, Colo., for defendant-appellant Aaron Keith Stevens.

Before BARRETT and McKAY, Circuit Judges, and BRIMMER, District Judge.*

BARRETT, Circuit Judge.

Appellants are among twenty-four defendants who were charged in an indictment with wilfully and knowingly conspiring with each other, several unindicted co-conspirators, and other unknown persons to transport in interstate or foreign commerce, motor vehicles, knowing the same to have been stolen. Twenty-five overt acts were specified in the indictment.

The indictment also charged, in separate counts, four substantive violations of 18 U.S.C. § 2312. These counts were severed prior to trial and are not before us on this appeal.

At trial, the Government established its case primarily through the immunized testimony of Ronnie, Jimmy and JoAnn Adams. The evidence presented, viewed in the light most favorable to the Government, indicated a number of diverse activities which were performed to achieve a single goal— that of the theft and interstate transportation of certain motor vehicles. Basically, the evidence suggested that salvage dealers sold specific parts of automobiles, trucks and campers to car thieves. These parts included the vehicle identification number plate, the stamped vehicle number on the frame rail, and title work. Another group of individuals acted as "spotters" who searched out vehicles similar to those from which the vehicle identification numbers had previously been obtained in various salvage yards. Once "spotted" those cars would be marked for theft. Still another group of individuals, utilizing specialized tools, would steal the vehicles. The stolen vehicles were then taken to garages, where the vehicle identification numbers from the salvaged vehicles were splice-welded into the recently stolen cars. The vehicles were then transported in interstate commerce and sold to both knowledgeable and innocent customers. The conspiracy was carried

* Of the United States District Court for the District of Wyoming, sitting by designation.

on primarily in California, Colorado, Nevada, and Texas.

At the conclusion of a two week trial, the Jury rendered verdicts of guilty as to Defendants Balloue, Carlson, Dixon, Igo, Leonhardt, Malone, Miller, Dee Duncan Mitchell, Joel Mitchell, Clarence Morrison, Judy Morrison, Petersen, Stevens and Wilson. All Defendants have appealed, with the exception of Clarence and Judy Morrison.

The primary issues raised on appeal are: (1) whether there was sufficient evidence introduced to sustain the Jury's determination of guilt as to each Defendant; (2) whether the evidence presented at trial established the existence of a single conspiracy; (3) whether the Court properly applied the co-conspirator exception to the hearsay rule; and (4) whether the District Court abused its discretion in refusing to grant Appellants' motions for relief from prejudicial joinder. Various secondary challenges have also been raised.

### Sufficiency of the Evidence

With the exception of Joel Mitchell, all Appellants challenge the sufficiency of the evidence underlying their convictions. In reviewing these contentions, we must view the entire record "in the light most favorable to the Government in order to determine whether the evidence, both direct and circumstantial, together with all reasonable inferences to be drawn therefrom, is substantial enough to establish guilt beyond a reasonable doubt." *United States v. Hubbard*, 603 F.2d 137, (10th Cir., 1979). On appeal, it is not the function of this Court to weigh conflicting evidence or consider the credibility of witnesses. *United States v. Gibbons*, 607 F.2d 1320, (77–1965, 10th Cir., September 11, 1979). In conspiracy cases, a jury's determination of guilt will not be disturbed where the record shows slight evidence of a particular defendant's connection with a conspiracy that has already been established through independent evidence. *United States v. Andrews*, 585 F.2d 961 (10th Cir. 1978). With these standards in mind, we now turn to an examination of the evidence regarding each of the Appellants.

#### A. James Balloue:

Balloue was named in only one overt act in the indictment. In Paragraph 12, the Grand Jury charged:

> On May 23, 1977, a 1969 Chevrolet three-quarter ton custom pickup was stolen in California by CLARENCE MORRISON and Ronnie Adams. The vehicle was altered by Adams and driven into Mexico by JAMES BALLOUE. [R., Vol. I, p. 4].

Thus, much of the evidence introduced by the Government concerned the theft, alteration and subsequent sale of the 1969 Chevrolet pickup. Specifically, Ronnie Adams testified that a 1969 Chevrolet pickup was stolen in the latter part of April or early part of May, 1977, from a location in Simi Valley, California. [R., Vol. XVII, p. 1347]. Thereafter, the stolen pickup was taken to a garage on Orangethorpe Avenue. [R., Vol. XVII, p. 1348]. At the garage, Adams testified that Balloue physically helped him alter the identification numbers on the vehicle. [R., Vol. XVII, pp. 1307–1349]. The vehicle was then taken to a One-a-Day paint shop, in Anaheim, California, where it was painted a different color. Later, Balloue drove the stolen pickup truck to Ensenada, Mexico, where it was left. [R., Vol. XVII, pp. 1307, 1348, 1349]. Ronnie, and his brother, Jimmy Adams, accompanied Balloue on this trip to Mexico. Ronnie specifically testified that he saw Balloue get in the truck prior to their departure and get out of the truck at Ensenada, Mexico.

As background, Ronnie Adams identified Balloue in court [R., Vol. XVII, p. 1270] and testified that he first met Balloue at Balloue's house in California. [R., Vol. XVII, p. 1292]. From there, he accompanied Balloue to a garage rented by Balloue. At the garage, Ronnie Adams discussed with Balloue the fact that one of the campers in the garage had been stolen and that Balloue was afraid to "move it" because he didn't have "paperwork" on it. [R., Vol. XVII, pp. 1292–1293, 1345]. Ronnie also testified that Balloue accompanied him on two or three trips to Mexico to take vehicles to Ensena-

da. [R., Vol. XVII, p. 1293]. He also identified photos of a truck stolen by Balloue and another man in Anaheim, California. [R., Vol. XVII, p. 1316].

Jimmy Ray Adams corroborated the testimony of his brother, Ronnie, with regard to Balloue's participation. He identified Balloue in the courtroom [R., Vol. XV, p. 1017]. Concerning the alteration and transportation of the 1969 Chevrolet pickup, Jimmy testified that Ronnie, Balloue and he altered the identification numbers in Los Angeles and aided Balloue in sanding the pickup so that it could be painted in Los Angeles at the One-a-Day paint shop. [R., Vol. XV, pp. 1044, 1045, 1064, 1065]. Later, Jimmy and Ronnie Adams followed Balloue to Ensenada, Mexico, where they "met a guy named Eddie." [R., Vol. XV, pp. 1045, 1056, 1064, 1080, 1081].

Jimmy also testified that various stolen vehicles were taken to a garage on Orangethorpe Boulevard in California where their identification numbers were changed and stored. Jimmy identified Balloue as one of the individuals who possessed a key to the garage. [R., Vol. XV, pp. 1037–1038].

Eddie Glumac, a car dealer from Ensenada, Mexico, identified James Balloue in the courtroom [R., Vol. XI, p. 551] and testified as to the circumstances surrounding his purchase of a 1969 Chevrolet pickup truck. [R., Vol. XI, pp. 546–551]. Glumac identified Balloue as the driver who accompanied Clarence Morrison when Morrison sold the 1969 Chevrolet pickup truck to Glumac in Ensenada, Mexico. [R., Vol. XI, p. 551].

In our view, the evidence of Appellant Balloue's guilt is overwhelming.

*B. Richard Carlson:*

Ronnie Adams was the sole Government witness to testify against Richard Carlson. Adams testified that in October or November of 1977, Clarence Morrison, Duane Malone, and he participated in the theft of a 1976 Ford pickup truck in LaBrea, California. [R., Vol. XVII, pp. 1297–1298, 1334–1335]. Following the theft, Adams followed Morrison and Malone in the stolen pickup to Carlson's house. [R., Vol. XVII, pp. 1298, 1335]. Once they arrived at Carl-

son's house, Adams was introduced to Carlson by Clarence Morrison and asked to pull the truck into the garage at the residence. [R., Vol. XVII, pp. 1296, 1297]. Due to the height of a camper shell on the back of the pickup, it was necessary to let the air out of the tires in order to pull it into the garage and shut the door. [R., Vol. XVII, pp. 1333]. Carlson let the air out of the tires and pulled the truck into the garage. Thereafter, Morrison told him to "go ahead and get the truck ready, and we would pick it up the next day, or whenever." [R., Vol. XVII, pp. 1297, 1333]. It was understood that by the phrase "get the truck ready" it was meant that Carlson should "change the rail and the V.I.N. on it." [R., Vol. XVII, pp. 1297, 1333]. According to Adams, Morrison picked up the vehicle two days later and transported it to Nevada. [R., Vol. XVII, pp. 1297, 1298]. Adams identified Exhibits 15, 15–A and 15–B as the vehicle stolen and subsequently driven to Carlson's residence. [R., Vol. XVII, p. 1308].

Initially, Adams was unable to identify Carlson in the courtroom, but later in the trial did positively identify Carlson, explaining that Carlson was dressed differently, sitting in a different portion of the courtroom and that when he had previously known him, Carlson had a full beard, mustache, and long hair. [R., Vol. XVIII, pp. 1471–1478]. Carlson testified that at the beginning of the trial he had a beard and mustache but shaved it off during the course of the trial. [R., Vol. XX, pp. 1645–1648].

Albert Harold Ray testified that he was employed by the State of Nevada, Department of Motor Vehicles, as an investigator charged with the responsibility of certifying Nevada motor vehicle records. In particular, he testified that he participated in the investigation and recovery of the vehicle pictured in Exhibits 15, 15–A and 15–B. [R., Vol. XIII, pp. 781, 784, 785]. He also testified that the vehicle pictured had been determined to be stolen [R., Vol. XIII, pp. 788, 789], and that the vehicle identification numbers on the frame rail of the vehicle had been altered. [R., Vol. XIII, pp. 798,

799]. The vehicle had been recovered from Al Gaspar Motors in Carson City, Nevada. [R., Vol. XIII, p. 788].

Carlson testified in his own defense and denied knowing Ronnie Adams prior to trial. [R., Vol. XX, p. 1641]. He admitted knowing Morrison, but said he had only done a couple of tune-ups and an engine overhaul for him. [R., Vol. XX, p. 1642]. He specifically denied ever performing a "rail job" on any vehicle. [R., Vol. XX, p. 1661].

In our view, the evidence presented was sufficient to sustain the Jury's verdict against Appellant Carlson.

### C. James Franklin Dixon :

The Government's evidence established without question that Dixon was a member of the conspiracy. The evidence presented indicated that Dixon possessed keys to the garage on Orangethorpe Boulevard [R., Vol. XV, pp. 1037, 1038]; painted and sanded vehicles at the garage on Orangethorpe Boulevard [R., Vol. XV, p. 1037]; was involved in changing a frame rail on a brown Ford pickup at Ronnie Adams' house [R., Vol. XV, pp. 965, 966]; was involved, with other co-conspirators, in the theft of a Dodge Supercab, a green and white Chevrolet, and a van in Fort Worth, Texas [R., Vol. XVI, p. 1130]; was arrested in California in a beige Camaro which had earlier been stolen by Clarence Morrison, Ronnie Adams and Chuck Shults [R., Vol. XIII, pp. 765–780; R., Vol. XVI, pp. 1175, 1176, 1177]; altered a stolen vehicle in California in May or April of 1977 with Ronnie Adams [R., Vol. XVIII, p. 1285]; was the "registered owner" of a stolen motor home [R., Vol. XV, p. 969]; was paid for transporting stolen vehicles [R., Vol., XVII, pp. 1326–1327]; and participated in the alteration of identification numbers on a motor home in California, which had previously been stolen in Grand Prairie, Texas, by Judy and Clarence Morrison, and JoAnn Adams. [R., Vol. XVII, p. 1317]. The Government's proof of Dixon's guilt was clear, convincing and overwhelming.

### D. Richard Igo :

The case against Igo is not strong. However, we hold that the evidence presented by the Government is sufficient to sustain his conviction. Ronald Adams testified that in the late summer or early fall of 1976 through most of 1977 he participated in the car theft ring. [R., Vol. XVII, p. 1266]. He identified Igo and stated that Igo delivered stolen cars in Texas to Joe Mitchell, in particular a " '76 Oldsmobile that he brought to Wichita and gave me the ignition, and all, which Mitchell drove me back to the vehicle to pick up to take to a garage that Clarence Morrison had rented for us in Wichita Falls, and I cut the vehicle down with a cutting torch." [R., Vol. XVII, p. 1284]. This occurred in January or February of 1977. [R., Vol. XVII, pp. 1268, 1284].

Jimmy Adams testified that while in Rancho, California with Clarence Morrison and Ronnie Adams, Clarence Morrison called Igo and Igo related that he and "Champs" Sosebee had driven a brown Supercab pickup from Texas to Los Angeles and that they needed money to get back to Wichita. [R., Vol. XV, pp. 1034, 1058]. Jimmy Adams also testified that in November of 1976, he was present at Joel Mitchell's "wrecking yard" with Igo and Jimmy's brother Ronnie, when he heard Joel tell Ronnie that he would give Igo $200 to pick up an Oldsmobile. [R., Vol. XV, pp. 1033, 1057]. Jimmy Adams positively identified Igo in court. [R., Vol. XV, p. 1015].

Sandra Adams first identified Richard Igo [R., Vol. XVI, p. 1120] and then testified that she had previously seen Igo at Joel Mitchell's "wrecking yard" in Wichita Falls, Texas, and heard them talking about "[d]ifferent cars that were gotten, and where they were taken, and what was to be done with them and all." [R., Vol. XVI, p. 1132].

Ronnie Adams identified Igo [R., Vol. XVII, p. 1268].

### E. Robert Leonhardt :

The primary evidence against Robert Leonhardt filtered through the testimony of Ronnie and JoAnn Adams. JoAnn Adams testified she knew Leonhardt [R., Vol. XV, p. 955] but was unable to identify him in

court [R., Vol. XV, p. 960]. When JoAnn first came to California, Judy Morrison "was driving me around to all of her friends' house[es], she went to visit friends here and there and everywhere, and this 'Big Bob' [Leonhardt] happened to be one of them . . . He lived in a house and she had taken her boy over there. He was going to stay overnight with him for awhile." [R., Vol. XV, p. 980].

Ronnie Adams provided the primary testimony against Leonhardt. He initially identified him in court [R., Vol. XVII, p. 1269] and testified that he had been at Leonhardt's house on one occasion. [R., Vol. XVII, p. 1289]. At that time, he testified there was a box of "stuff" "locked up" which contained "part of the frame that has the identification number on it which is cut out. And the tab on the door, which is the quarter piece in a van. It was at his house." [R., Vol. XVII, p. 1290; R. Vol. XVIII, p. 1456]. The Government failed to elicit, in view of the fact that the box was "locked up", how Ronnie knew of its contents. Even so, no objection was posed to his direct testimony and no challenge was made upon cross examination. The material in the box was subsequently used in the alteration of a stolen van. [R., Vol. IX, pp. 289–302; R., Vol. XVII, pp. 1309–1310].

Ronnie Adams also testified that he changed a partial rail on a stolen Supercab that was brought to his house by Red Taylor and Joel Mitchell. He then stated that the Supercab was driven to California by Richard Igo and "Champs" Sosebee and left at "Big Bob's" [Leonhardt]. From there, Clarence Morrison apparently picked it up and it was later confiscated by the California Highway Patrol. [R., Vol. XVII, pp. 1306, 1307]. With regard to the dropping off of this truck, however, Adams stated that he had no personal knowledge ". . . [o]ther than what I heard being talked about on the phone . . ." [R., Vol. XVIII, pp. 1455, 1456].

In our view, there is sufficient evidence to link Leonhardt to the conspiracy. The Government introduced testimony through Ronnie Adams, that Adams had been at Leonhardt's house on one occasion and had observed a box which contained part of a frame that had the identification number on it and the tab of the door—the quarter piece of the van. Although the Government failed to elicit testimony as to how Adams acquired this knowledge from a container described as a "locked" box, no challenge or objection to this testimony was lodged. Thus, the Jury could properly infer that Adams had a sound basis for this testimony, i. e., that the term "locked" box was simply descriptive of the box which must necessarily have been "unlocked" and open when viewed by Adams. This testimony of Adams, coupled with the fact that a stolen car had been left at Leonhardt's and later picked up by another member of the conspiracy is sufficient to link Leonhardt to the conspiracy. Accordingly, we affirm the Jury's finding of guilt.

### F. Jodie Stewart Malone:

Sandra Adams, Jimmy Adams' wife, testified that Jimmy and she drove a stolen camper from Grand Prairie, Texas, to the Orangethorpe garage in California. From there, they called Jodie Malone, who picked them up and drove them to her house. During this period of time, Jodie Malone asked Jimmy and Sandra where the camper had come from, and did not express surprise that it was stolen. [R., Vol. XVII, pp. 1133, 1134].

Ronnie Adams testified that he stayed at Jodie Malone's house, and on numerous occasions participated in "spotting trips" with Ms. Malone in both California and Texas locating trucks for possible theft. [R., Vol. XVII, pp. 1295, 1344; R., Vol. XVIII, pp. 1451, 1452].

Jimmy Adams identified Jodie Malone [R., Vol. XV, p. 1017], and testified that he had asked her where her husband Duane was, and that she replied that he was "out to pick up a vehicle or something" meaning to "[s]teal a vehicle". [R., Vol. XV, p. 1046].

Various other Government witnesses provided background information as to Jodie Malone. For example, Steven Schlingman testified that Malone had been present in

the shop during the general period of time in which "frame rail jobs" were being performed on stolen vehicles. [R., Vol. XI, pp. 629, 634, 653]. Jim Hitt identified Jodie Malone as the person from whom he purchased a 1975 Chevrolet van in April of 1976 for $3,600.00. The vehicle was later impounded by the Los Angeles County Sheriff's Department. [R., Vol. XI, p. 533].

The Government also introduced in evidence Exhibit 22F which was identified as a document of transfer or sale of a car which was later determined to be stolen, apparently signed by Jodie Malone and purportedly notarized by Dee Duncan. [R., Vol. XI, p. 600]. See also: Exhibit 22G.

The Government's evidence was sufficient to link Jodie Malone to the conspiracy.

### G. Johnny Miller:

Jimmy Adams identified Johnny Miller in court [R., Vol., XV, p. 1018] and testified that he [Jimmy Adams] was present at a meeting in Butterfield Estates, California, with Ronnie Adams, Johnny Miller, Ronald Petersen, Clarence Morrison, and another individual where they discussed the possibility of locating a garage where the group could "change rails on vehicles." [R., Vol. XV, pp. 1019, 1020, 1021]. Miller, Ronnie Adams and Jimmy Adams were to physically perform the rail changes. [R., Vol. XV, p. 1021]. Jimmy Adams testified that several months following the initial meeting, another meeting was held attended by Ronnie Adams, JoAnn Adams, Judy Morrison, Clarence Morrison, Miller, and another individual concerning the procurement of identification numbers from wrecked cars at Joel Mitchell's and Joe Wilson's "wrecking yards" and the subsequent installation of those identification numbers in stolen cars. [R., Vol. XV, pp. 1023, 1024].

According to Jimmy Adams, Miller also participated in the theft of a camper with Ronnie Adams and Clarence Morrison. Following the theft, the camper was taken to Butterfield Estates where Miller changed the vehicle identification number plate on the camper before Jimmy and Sandra Adams took the camper back to Texas. [R., Vol. XV, pp. 1033, 1034, 1038, 1039, 1046].

Prior to the theft, Jimmy Adams flew to San Diego at Clarence Morrison's request to pick up the camper, and Morrison arranged for Miller to pick Adams up at the airport. [R., Vol. XV, p. 1046]. Following the arrival of the Adamses in Texas with the camper it was determined that law enforcement personnel were closing in on the stolen vehicle and, at Clarence Morrison's request, the vehicle was burned by Jimmy Adams and Sandra Adams. [R., Vol. XV, pp. 1039, 1040].

Sandra Adams testified that in the spring of 1977, she flew to San Diego with her husband, Jimmy Adams, to pick up a stolen camper and drive it back to Texas. Upon arrival at the airport, she was picked up by Johnny Miller. They discussed where they were going to pick up the camper and the fact that the VIN numbers would have to be changed prior to starting back to Texas. She stated that Johnny Miller performed the VIN change at Butterfield Estates, and that the vehicle was subsequently driven to Texas where it was later burned. [R., Vol. XVI, pp. 1124, 1125].

Ronnie Adams confirmed Jimmy Adams' testimony that he, Jimmy Adams, Clarence Morrison, and Johnny Miller stole a Campway motor home in California and that the motor home was later burned in Texas. [R., Vol. XVII, pp. 1300, 1301, 1302].

While there were some contradictions rebutting this testimony, it is clear that we must defer to the Jury's resolution of the conflicts and assessments of the credibility of the witnesses. Accordingly where sufficient evidence is presented to sustain the Jury's judgment, we must uphold the conviction. The evidence is sufficient to uphold the Jury's determination as to Appellant Miller.

### H. Dee Duncan Mitchell:

Bernice Brewer, a former owner of a 1971 Ford Econoline van, identified her [Brewer's] signature on a title document she signed in the latter part of 1976 as part of consummating an insurance claims transaction with Allstate Insurance Company in Oklahoma City, Oklahoma. [R., Vol. VII,

pp. 58, 59, 60]. The title also contained the notarized signature of Dee Duncan which was purported to have been signed in Wichita Falls, Texas. Brewer testified that she did not know either Dee Mitchell or Dee Duncan, and, that she had not signed her name in front of Dee Duncan or in Wichita Falls, Texas. [R., Vol. VII, p. 60]. Herman Brewer, her husband, confirmed much of her testimony. [R., Vol. VII, pp. 49–58].

The most damaging testimony came from Sandra Adams. She identified Dee Duncan [R., Vol. XVI, p. 1120] and testified that she was asked to get a "quick title" for a stolen Dodge Supercab and was sent to Joel Mitchell's "wrecking yard" to obtain it. At the "wrecking yard", she witnessed Dee Mitchell "fixing" the paper work up, and following its completion, she was asked to sign the vehicle into her name. Then she and Ronnie Adams took the paper work to the courthouse and had it changed to a Texas title. They then took it to the Texas Highway Department and obtained a one-day title which was used to sell the car. [R., Vol. XVI, pp. 1129–1131].

Ronnie Adams stated that Dee Duncan aided the operation by notarizing paper work and signing fictitious names to titles. [R., Vol. XVII, p. 1283]. His brother, Jimmy Adams testified, albeit in a conclusory and general manner, that he observed Dee Duncan participate in the theft operation. [R., Vol. XV, p. 1036]. He observed Dee Duncan notarize papers for Ronnie Adams in a somewhat surreptitious manner. [R., Vol. XV, p. 1036]. He also testified that he had in his possession various title papers that were notarized by Dee Duncan and given him by Joel Mitchell. The title papers were stored in an apartment rented by Clarence Morrison in Los Angeles in the latter part of 1977 with vehicle identification number plates. [R., Vol. XV, pp. 1030–1036]. JoAnn Adams testified that she had seen Dee Duncan working in Joel Mitchell's "wrecking yard" notarizing paper, but did not specifically link that activity to the conspiracy. [R., Vol. XV, p. 968]. Notary signatures which purport to be Dee Duncan's also appear on several exhibits admitted in evidence at trial. See e. g.: Exhibits 8G, 8F, 22E, 22F.

The evidence presented by the Government is not overly persuasive as to Dee Duncan Mitchell's participation in the conspiracy. Nevertheless, we believe that the Government presented sufficient evidence to sustain the Jury's verdict. Specifically, the Government showed, through the testimony of Sandra Adams, that she personally witnessed Dee Duncan "fixing up" a "quick title" for a stolen Dodge Supercab. It is also significant, in our view, that Jimmy Adams testified that several title papers notarized by Dee Duncan were given to him by Joel Mitchell along with vehicle identification numbers and subsequently stored at an apartment rented by Clarence Morrison for use in the conspiracy. Dee Duncan Mitchell's participation in the conspiracy is buttressed by the corroborating testimony of Herman Brewer, Bernice Brewer, JoAnn Adams, and Ronnie Adams.

### I. Ronald Petersen:

Ronnie Adams testified that he first met Ron Petersen at Petersen's home near San Diego, California in the spring of 1977. During this first meeting, there was a discussion concerning a stolen Granada that was supposed to be taken to Petersen for transportation to one of Petersen's friends in Mexico. [R., Vol. XVII, pp. 1302, 1303]. Adams also testified that at his second meeting with Petersen, which occurred near Rancho, California, Clarence Morrison, Chuck Shults, Jimmy Adams, Ronnie Petersen and Ronnie Adams discussed plans to have Petersen find the group a garage in which to alter vehicles. [R., Vol. XVII, p. 1304]. Jimmy Adams confirmed the existence of this meeting. [R., Vol. XV, p. 1021].

Significant also, is Ronnie Adams' testimony and identification concerning a stolen vehicle which was subsequently taken to Ron Petersen's house. The truck was stolen in Anaheim, California, by Jim Balloue, taken to One-a-Day paint shop and painted. Thereafter, the vehicle was transported to Ronald Petersen's home. It was subsequently confiscated by the California Highway Patrol. [R., Vol. XIII, pp. 765–780; R.,

Vol. XVII, pp. 1315, 1316; R., Vol. XVI, pp. 1175, 1176]. There was also testimony, although not specifically linked with the conspiracy, that Petersen asked Clarence Morrison and Ronnie Adams to re-stamp the identification numbers on a stolen boat that was at Petersen's residence during Ronnie Adams' first visit there. [R., Vol. XVII, p. 1303].

Petersen's father, Keith Petersen, testified that he purchased a 1974 GMC pickup truck from his son. Mr. Petersen picked up the GMC truck in California and drove it back to Washington. Subsequently, the '74 GMC pickup truck was sold to Don Campanoli. [R., Vol. VIII, pp. 178, 179, 236, 237]. The vehicle was later determined by the Washington State Patrol to have been stolen and the vehicle identification numbers altered. [R., Vol. X, pp. 388–392].

Keith Petersen also purchased a second truck from his son for $5,500.00. [R., Vol. VIII, pp. 239–240]. The second vehicle was brought to the father's residence in Washington from California by one of Ronnie Petersen's friends, Danny. [R., Vol. VIII, pp. 244, 245]. When Keith Petersen took the second truck down to have it licensed he was informed by the Washington State Patrol that the truck would have to be impounded. [R., Vol. VIII, p. 249]. The vehicle identification numbers on the truck had been ground off and restamped. [R., Vol. X, pp. 382–389].

While the direct evidence of Petersen's involvement is not overwhelming, the circumstantial evidence is such that the Jury could have linked Petersen to the conspiracy.

*J. Aaron Keith Stevens:*

The Government presented its case against Aaron Keith Stevens primarily through the testimony of two California Highway Patrol officers and that of Jimmy Adams and Ronnie Adams.

The first witness, Emmitt Ryan, testified that he was employed by the California Highway Patrol in Los Angeles, California, as a vehicle theft inspector. Ryan conducted a surveillance of the One-a-Day paint shop in Anaheim, California. During the

course of the surveillance, Ryan took covert photographs of a brown and white Ford Supercab truck. These photographs were admitted in evidence. Ryan identified Clarence Morrison, Judy Morrison, and Aaron Keith Stevens as occupants of the vehicle. [R., Vol. XII, pp. 729–744].

Kenneth J. Slee testified that he was also employed by the California Highway Patrol as a vehicle theft investigator in Los Angeles, California. Slee, too, was involved in the surveillance of the One-a-Day paint shop. During the course of the surveillance, he observed the brown and white Ford Supercab truck depicted in the photographs taken by Emmitt Ryan, in which Aaron Stevens was identified as an occupant. Slee testified that this vehicle was later seized on a public street in front of 436 Willow Way Lane, Aaron Stevens' residence. Following the seizure, Slee recovered a Texas registration from the vehicle and it was determined the VIN numbers on the truck did not match those assigned to a Supercab model by the manufacturer. Simultaneous with this seizure, a stolen motor home was recovered at the same address ostensibly registered to Clarence Morrison. [R., Vol. XVI, pp. 1168–1172; R., Vol. XVII, pp. 1226–1229].

Jimmy Adams testified that Stevens had a key to the Orangethorpe garage where the alteration of some vehicles occurred. All of those who had keys to the garage helped in the operations at the garage. Jimmy Adams saw Stevens at the garage approximately ten to fifteen times. In mid-1977, Jimmy Adams observed Stevens enter the garage and state that Clarence Morrison offered him "some money to do a rail job on it [a Ford pickup in the garage], but he said he didn't have time to do it, and me and Ronnie done it." [R., Vol. XV, p. 1044]. On other occasions, Stevens assisted in other work, or would simply be looking for Morrison. None of the vehicles in the garage were legitimately purchased. [R., Vol. XV, pp. 1037, 1038, 1043, 1044, 1049–1055].

Ronnie Adams, an immunized co-conspirator, stated that "Mr. Stevens was at our

garage on Orangethorpe on numerous occasions," and that on two of these, Stevens was present while "[we] was grinding the numbers off of a vehicle." [R., Vol. XVII, pp. 1290–1291]. Adams testified that Stevens "knew what was going on" at the Orangethorpe garage and was one of several persons who had a key to the garage. On one occasion, he observed Stevens painting a truck at the garage. The truck was not identified as stolen; however, there was no evidence offered to the effect that the truck was not stolen. [R., Vol. XVII, pp. 1290–1292; R., Vol. XVIII, pp. 1404–1407]. On another occasion, a stolen motor home was left at Aaron Stevens' house. [R., Vol. VII, pp. 88–98; R., Vol. XVII, p. 1309].

We believe that the evidence presented was sufficient to tie Stevens to the conspiracy. He possessed a key to the Orangethorpe garage and frequented it on numerous occasions. On two of the occasions, he was present while vehicle identification numbers were ground off vehicle frames and restamped. Ronnie Adams and Stevens discussed the operations of the garage and "[he] knew all the time" of the group's activities concerning illegal vehicles. This evidence, combined with that of the two California Highway Patrol officers, is sufficient to tie Stevens to the conspiracy and sustain the Jury's verdict of guilty.

*K. Joe Wilson:*

With regard to Joe Wilson's involvement, Jimmy Adams testified that Wilson's salvage yard—Wichita Auto Salvage—was one of the places in which frame rails, vehicle identification numbers, and other parts were taken from wrecked cars so that they could be used in the alteration of recently stolen vehicles. [R., Vol. XV, p. 1024]. As to specific instances, he testified that in the summer of 1976, Clarence Morrison, Ronnie Adams, and he went to Wilson's junk yard in order to obtain identification numbers from several vehicles. The frame rails were taken out of the vehicles, vehicle identification number plates removed, and the remaining parts scattered around the yard so the vehicles could not be identified. Exhibits 15–M and 15–O are pictures similar

to one of the vehicles which was cut up at the time. The VIN plate on that particular vehicle was "popped" by Clarence Morrison. Ronnie Adams and Morrison directed Jimmy to get a winch truck from Wilson in order to scatter the parts around the yard. After discussion with Jimmy, Wilson sent someone down with the truck to assist in scattering the parts. [R., Vol. XV, pp. 1023–1027]. Jimmy Adams positively identified Wilson. [R., Vol. XV, p. 1016].

Sandra Adams, Jimmy's wife, testified that she did not know Joe Wilson but that she had heard the name and had heard Clarence Morrison and her husband on one occasion discussing their plans to "pick some vehicles up because Joe Wilson wanted them out at his yard." [R., Vol. XVI, p. 1159].

Ronnie Adams also testified concerning his involvement with Joe Wilson. Ronnie stated that Wilson was the owner, or part owner, of a "wrecking yard" in Wichita Falls, Texas, where he had cut up several vehicles so as to obtain the frame rail and VIN plates. At Wilson's yard, he was working under the direction of Clarence Morrison. Although he did not see money exchange hands between Wilson and others, he was told by Clarence Morrison that Morrison had paid Wilson $750 for the frame rail and VIN plate of a truck. Later, Ronnie stated that Clarence Morrison told him Wilson's prices for VIN, rail and title were more than the prices charged by Joel Mitchell at his "wrecking yard." Mitchell normally charged $500 for vehicles manufactured up to the year 1973 and $750 for those vehicles manufactured in 1973 and thereafter. As an example of the difference in prices, he stated that Clarence Morrison paid Joe Wilson $900 for the frame rail and title to a 1974 Chevrolet truck. [R., Vol. XVII, pp. 1285–1288, 1327–1328; R., Vol. XVIII, pp. 1422–1426].

Kenneth Henson, of the Motor Vehicle Theft Service of the Texas Department of Public Safety, testified concerning his three visits to Wilson's salvage yard in Wichita Falls, Texas. On June 8th, 1977, he visited the salvage yard where he took photos of

the cab of a Ford pickup, establishing that the identification numbers on the cab had been removed. He also took a photo of both the rear and front end assembly of the truck. He testified that his inspection of the vehicle showed that all identification numbers had been removed. The photos taken by Henson were Exhibits 15–O and 15–M, the same photos which Jimmy Adams testified to, displaying a truck similar to the truck which he, Ronnie and Clarence Morrison removed the identification numbers from. Exhibit 15–N was introduced through Henson's testimony as a federal safety sticker containing the identification number of the truck which was removed from its cab. Henson positively identified Wilson in the courtroom. [R., Vol. XIV, pp. 848–859; R., Vol. XV, p. 1025].

The evidence was more than adequate to support the Jury's determination that Wilson was a participant in the conspiracy and had knowledge of its objects—interstate transportation of stolen vehicles.

### Single versus Multiple Conspiracies

As indicated earlier, the indictment charged a single conspiracy in a single count. Twenty-four individual defendants were named, and twenty-five overt acts were specified. At trial, the Government sought to establish that all of the defendants, and certain unnamed individuals, conspired to transport in interstate or foreign commerce, motor vehicles, knowing the same to have been stolen. Appellants contend, in general, that while their convictions were obtained on the theory that all defendants were members of the single conspiracy, the proof, in fact, disclosed multiple conspiracies, thus resulting in a variance, substantially prejudicing their rights and requiring reversal under the authority of *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Appellants' concerns, of course, center around the keystone of our criminal justice system that "[g]uilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application." *Id.* at 772, 66 S.Ct. at 1252. While the issue presented is not unique, it is, nevertheless, always an area of concern where numerous defendants, multiple transactions, and various degrees of participation are found in a single case. *See: United States v. Butler*, 494 F.2d 1246 (10th Cir. 1974). Due to the continuing importance of this concept, we deem it important to review many of the traditional legal precepts applied by the courts relating to concerted criminal activity.

Our starting point is the seminal case of *Kotteakos v. United States, supra.* The facts of *Kotteakos* are critical to an understanding of its holding. In that case, the indictment charged a single conspiracy. The Government's evidence, however, established the existence of eight separate conspiracies with only one common element. That common element was the participation of one Simon Brown in each of the conspiracies. Although each of the conspiracies had similar illegal objects, i. e., obtaining government loans by fraudulent representations, none of the participants, other than Brown, had any knowledge of, nor did they aid in, or profit from the other conspiracies.

By reason of the existence of this unique factual situation, the Court drew an analogy to that of a wheel. Thus, Brown constituted the "hub" while each of the eight separate conspiracies were but "spokes" of the "wheel". Inasmuch as the Government failed to prove any connection between the independent conspiracies, notwithstanding that all dealt with Brown as their agent, the "rim of the wheel to enclose the spokes" was not complete and the existence of a single conspiracy was not established.

Recognizing the potential for prejudice involved in trying several defendants together where proof of a single conspiracy is lacking, *Kotteakos* imposed a prophylactic rule requiring, upon proof of multiple conspiracies, reversal where an individual defendant's substantial rights have been affected. In so doing, the Court sought to avoid the possibility of transfer of guilt from members of one conspiracy to members of another, observing that each individual defendant has "the right not to be

tried *en masse* for the conglomeration of distinct and separate offenses committed by others." *Kotteakos v. United States,* 328 U.S. at 775, 66 S.Ct. at 1253.

The Court further refined and somewhat limited the impact of *Kotteakos* when it rendered *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). In *Blumenthal,* the indictment charged a single conspiracy to sell whiskey at prices above the ceiling set by the Office of Price Administration. The owner of the whiskey devised an intricate system, using a series of middlemen, whereby he sought to conceal the true price of the whiskey sold. At trial, evidence was adduced to show that some of the middlemen had no contact with each other and did not know the identity of the owner, or other middlemen. Nevertheless, because of the functions each performed, the Supreme Court concluded that "in every practical sense the unique facts of this case reveal a single conspiracy of which the several agreements were essential and integral steps." *Id.* at 559, 68 S.Ct. at 257. Thus, the Court adopted the concept of the "chain conspiracy".

In *United States v. Elliott,* 571 F.2d 880 (5th Cir. 1978), *cert. denied,* 434 U.S. 1021, 98 S.Ct. 747, 54 L.Ed.2d 769 (1979), the Court reviewed the "chain conspiracy" concept and its limits:

> The essential element of a chain conspiracy—allowing persons unknown to each other and never before in contact to be jointly prosecuted as co-conspirators—is interdependence. The scheme which is the object of the conspiracy must depend on the successful operation of each link in the chain. 'An individual associating himself with a "chain" conspiracy knows that it has a "scope" and that for its success it requires an organization wider than may be disclosed by his personal participation'. *United States v. Agueci,* 310 F.2d 817, 827 (2nd Cir. 1962) *cert. denied,* 372 U.S. 959 [, 83 S.Ct. 1013, 10 L.Ed.2d 11] . . . . (1963), 'Thus, in a "chain" conspiracy prosecution, the requisite element—knowledge of the existence of remote links—may be inferred

solely from the nature of the enterprise.' *United States v. Perez, supra,* 489 F.2d [51] at 59, note 10.[24]

\*   \*   \*   \*   \*   \*

The rationale of *Blumenthal* applies only insofar as the alleged agreement has 'a common end or single unified purpose'. *United States v. Morado,* 454 F.2d 167, 170–171 (5th Cir. 1972); *United States v. Lloyd,* 425 F.2d 711 (5th Cir. 1970). *Generally, where the government has shown that a number of otherwise diverse activities were performed to achieve a single goal, courts have been willing to find a single conspiracy.*[25] This 'common objective' test has most often been used to connect the many facets of drug importation and distribution schemes.[26] The rationale falls apart, however, where the remote members of the alleged conspiracy are not truly interdependent or where the various activities sought to be tied together cannot reasonably be said to constitute a unified scheme. [Emphasis supplied]. [Footnotes omitted].

571 F.2d at 901.

In *United States v. Parnell,* 581 F.2d 1374 (10th Cir. 1978), *cert. denied,* 439 U.S. 1076, 99 S.Ct. 852, 59 L.Ed.2d 44 (1979), we stated:

> The fact that a number of separate transactions may have been involved . . . does not establish the existence of a number of separate conspiracies. The evidence adduced at trial revealed that over a period of two months, appellants and others carried out a single scheme to obtain grain fraudulently . . . The scheme was accomplished through a series of similar transactions, each of which was one design and each of which was part of one basic and overriding plan. The separate grain transactions can reasonably be considered as the operations of a going concern, understood by all the participants to be so, rather than as separate transactions or groups of transactions . . . . Some of the participants remained with the enterprise from its inception until it

was brought to an end, and others joined or left the scheme as it went along. The participation of each overlapped with the participation of others, however, and this overlap [which was] among the individuals, combined with the repeated nature of the operation which the scheme employed, are facts from which the jury could infer that appellants knew they were participating in a larger ongoing conspiracy . . . . It is not necessary, of course, that each member in a conspiracy be acquainted with the others, or have knowledge of all of the details of the plan.

581 F.2d at 1382.

*United States v. Watson*, 594 F.2d 1330 (10th Cir. 1979) dealt with the precise issue at hand in a case involving a "chain conspiracy". We there stated:

> Where large quantities of narcotics are being distributed, each major buyer may be presumed to know that he is part of a wide-ranging venture, the success of which depends on performance by others whose identity he may not even know. *United States v. Heath*, 580 F.2d 1011, 1022 (10th Cir.). We are satisfied that the evidence here shows a common design to acquire and distribute heroin and cocaine, *id.*, at 1022, and that it was permissible to link the appellants with Thompson and Anderson. *Whether the evidence was sufficient to establish a single conspiracy charge* [11] *was a question for the jury.* [Emphasis supplied]. [Footnote omitted].

594 F.2d at 1340.

■ We have carefully reviewed the record in this matter and we have summarized much of the evidence presented by the Government as it relates to the individual Appellants. This evidence, combined with the other evidence presented by the Government, convinces us that the Government proved that all Appellants engaged in a number of diverse activities performed to achieve a single goal. In our view, each Appellant inferentially, if not actually, knew that the ultimate object of the conspiracy depended on the successful opera-

tion of each link in the chain. The links in this conspiracy were clearly established and welded together in order to achieve a single goal—that of theft and interstate transportation of motor vehicles. Thus, we hold that the Government's proof established a single conspiracy.

### The Co-Conspirator Exception to the Hearsay Rule

Appellants Balloue, Carlson, Dixon, Igo, Mitchell, and Petersen contend that there was insufficient independent evidence introduced by the Government to prove the existence of a conspiracy as a condition precedent to permitting the Jury to consider the hearsay statements of other co-conspirators. Both the Government and the complaining Appellants contend that our determination of this issue is controlled by *United States v. Andrews, supra*.

In *Andrews*, we considered the effect of the Federal Rules of Evidence on our rule then in effect which allowed the judge and jury to share the responsibility for determining whether a statement made by one member of a conspiracy, during the course of and in furtherance of the conspiracy, may be used against other members of that conspiracy. Following the rule laid down in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977), we held, in *Andrews*, that such statements could be admitted, at the close of all evidence and prior to submission of the case to the jury, only if the trial judge determines that it is "more likely than not" that the conspiracy existed, that the declarant and the defendant against whom the conspirator's statement is offered were members of that conspiracy, and that the statement was made during the course and in furtherance of the conspiracy. In adopting the "more likely than not", or preponderance of the evidence, standard applicable at this stage of the trial, we modified our prior rule in view of the impact of the Federal Rules of Evidence. Our prior rule required only that the trial judge initially determine whether there was *prima facie* independent evidence establishing proof of the elements enumerated above; if

so, the judge was then to submit these matters to the jury for its determination, in deliberations. The jury was instructed that it must determine whether or not the Government established the three elements beyond a reasonable doubt before considering the co-conspirator hearsay statements. We recognized in *Andrews* that the new rules thus placed greater responsibility on the trial judge in determining the quantum of proof of the essential elements aforesaid.

Initially, we deem it important to determine whether we should apply our rule laid down in *United States v. Andrews, supra,* retroactively, as the Government and Appellants would apparently have us do. In *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Supreme Court exhaustively discussed the doctrine of retroactivity, referring to both civil and criminal cases. In particular, the Court stated:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed, . . . Second, it has been stressed that "we must . . . weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker, supra,* [381 U.S. 618] at 629 [, 85 S.Ct. 1731, 14 L.Ed.2d 601.] Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity."
> *Chevron Oil Co. v. Huson,* 404 U.S. at 106–107, 92 S.Ct. at 355.

Applying the first prong of this tripartite test, we observe that our decision in *Andrews* applying the "preponderance" test to the quantum of proof necessary for the admission in evidence of a co-conspirator's hearsay statement modified previous decisions of this Court to confirm Congress' mandate expressed in its passage of the Federal Rules of Evidence. Prior to *Andrews,* responsibility for determining the admissibility of such statements, as a preliminary matter, was that of the trial judge. The hearsay statements were admissible if the court concluded that the government had introduced *prima facie* independent evidence showing the existence of the conspiracy; that the defendant against whom it was offered and the declarant were members thereof; and that the statement was made in the course of and in furtherance of the conspiracy. The ultimate determination of admissibility and use, however, was that of the jury. *See: United States v. Montgomery,* 582 F.2d 514 (10th Cir. 1978), *cert. denied,* 439 U.S. 1075, 99 S.Ct. 850, 59 L.Ed.2d 42 (1979); *United States v. Gutierrez,* 576 F.2d 269 (10th Cir. 1978), *cert. denied,* 439 U.S. 954, 99 S.Ct. 351, 58 L.Ed.2d 345 (1978); *United States v. Lemon,* 497 F.2d 854 (10th Cir. 1974); *United States v. Pennett,* 496 F.2d 293 (10th Cir. 1974). The changes made by Congress in this area, raised new issues which we believe were subsequently resolved by our *Andrews* decision, which established new principles of law.

The second prong of *Chevron Oil* requires us to determine whether prospective application will further the purposes of and the interests protected by our decision in *Andrews.* We have carefully weighed our decision. In our view, *Andrews* establishes a preferable manner in which to insulate a defendant from the danger of prejudice should the jury rely upon co-conspirators' statements which should not be attributed to him. Nevertheless, this danger for prejudice, in view of the actual precaution exercised in applying our prior rule, is not such as to require retroactivity. Our prior rule vested the initial decision with the trial court based upon a showing of *prima facie* independent evidence. It fully permitted defendants to strenuously argue to the jury,

prior to the court's submission of the case, that the statements should not be attributed to them. This, we believe, provided adequate protection. Moreover, our decision in *Andrews* was not based on constitutional grounds; rather it was premised on the proposition that the recently adopted Federal Rules of Evidence altered the procedural requirements in this area.

Finally, we consider whether retroactive application of our decision in *Andrews* will produce "substantial inequitable results" in this case. This, of course, is tied to our discussion under the second prong of the test. Basically, our view is that the prior procedures sufficiently protected defendants from the dangers inherent in the admission of co-conspirator hearsay statements. The retroactive application of *Andrews*, while perhaps beneficial to the Defendants in this case, is not crucial to our holding. We also observe that the issues presented here concerning retroactivity were not briefed on appeal.

■ In sum, we hold that our opinion in *United States v. Andrews, supra*, should be applied prospectively only. Our decision in this regard accords with the views of other Circuits. See: *United States v. Mackedon*, 562 F.2d 103 (1st Cir. 1977); *United States v. Smith*, 578 F.2d 1227 (8th Cir. 1978); and *United States v. James*, 590 F.2d 575 (5th Cir. 1979) (en banc).

We have carefully reviewed the evidence as to each complaining Appellant in regard to this issue. We observe that in the instant case the District Court employed the test previously adhered to in this Circuit.

Following the presentation of the Government's case in chief, the Trial Judge ruled that the Government had presented sufficient evidence, independent of the hearsay statements, to support a finding by the Jury as to each Defendant concerning the existence of the requisite elements.

■ Appellant Dixon contends that the District Judge committed prejudicial error at this juncture of the proceedings by making his finding of preliminary fact in the presence of the Jury. We do not agree. It is our view that the technique employed by the Court in this case was not prejudicial or clear error. Although the Court did make findings of preliminary fact in the presence of the Jury, the Court emphasized that the Jury alone was to make the ultimate decision of whether, beyond a reasonable doubt, the evidence introduced, independent of the acts and statements of the alleged co-conspirators, proved the existence of the necessary elements. He instructed the Jurors that they "may, but [are] most emphatically . . . not required to consider the acts and statements of the person made outside the presence of the other alleged co-conspirators stemming from the case." [R., Vol. XX, pp. 633–635]. Significantly, no objection to the trial court's procedure was lodged at trial.

We have also considered the Court's instructions to the Jury. It is significant to note that the District Court, following the rule previously adhered to in this Circuit, instructed that it was within the sole province of the Jury to determine whether the Government proved, beyond a reasonable doubt by independent evidence, that the conspiracy charged existed; that the defendant was a member of the conspiracy; and that the statements and acts were knowingly made and committed during the continuance of the conspiracy and in furtherance of some object or purpose thereof. The District Court properly complied with the rules set forth in *United States v. Montgomery, supra; United States v. Gutierrez, supra; United States v. Lemon, supra*; and *United States v. Pennett, supra*.

■ Our review of the record as to each of the complaining Appellants convinces us that the District Court properly found, in its preliminary ruling on the admissibility of the hearsay evidence, that there was enough evidence presented by the Government, independent of the hearsay statements, to link each of the Defendants to the conspiracy, thereby allowing the Jury to properly determine the issue of whether that hearsay testimony should be considered against the Defendants involved.

We have held that the rule adopted in *United States v. Andrews, supra,* interpretive of the mandates of the new Federal Rules of Evidence, is not to be applied retroactively. Accordingly, the District Court did not err as to any of the complaining Appellants on this point. Even so, we believe that the practical difficulties involving the application of our standard adopted in *United States v. Andrews, supra,* require further discourse.

As previously observed, *Andrews* established a new test for determining when a statement of a co-conspirator is admissible against a defendant under Rule 801(d)(2)(E) of the Federal Rules of Evidence, which removes statements made by a co-conspirator of a party opponent during the course and in furtherance of the conspiracy from the operation of the hearsay rule. Our *Andrews* holding was simply that a district court judge, under Rule 104 of the Federal Rules of Evidence, must determine, prior to admission of the hearsay statement, as a factual matter, that the Government has shown by independent evidence that it is more likely than not that (1) the conspiracy existed; (2) the declarant and the defendant against whom the conspirator's statement is offered were members of the conspiracy; and (3) the statement was made during the course of and in furtherance of the objects of the conspiracy. We did not then elect to suggest a procedure outlining how this determination could be made.

The recurring nature of the issues presented herein have been forcibly impressed upon us. We have carefully considered the literature and opinions on this subject and recommend to the district courts the En Banc decision in *United States v. James, supra.* Exercising its supervisory power over the district courts, the *James* Court adopted a series of rules designed to control the issues surrounding the admissibility of hearsay statements by co-conspirators.

*First,* the Court ruled, as did we in *Andrews,* that Rule 104(a) of the Federal Rules of Evidence requires the judge alone to make the determination as to admissibility of hearsay co-conspirator statements. *Second,* because of the Court's conclusion that the district court's "threshold determination of admissibility is normally to be made during the presentation of the government's case in chief and before the evidence is heard by the jury" [*Id.* at p. 581], a "substantial" independent evidence rule was applied,[1] rather than one requiring, *at the initial stages of the proceedings,* a "preponderance" of the evidence. *Third,* the Court determined that it is preferable, whenever possible, to require the Government to first introduce independent proof of the conspiracy and, subsequent thereto, to establish the connection of the defendant with the conspiracy before admitting hearsay declarations of co-conspirators. However, it was recognized that in certain instances where it is not "reasonably practicable to require the showing to be made before admitting the evidence, the court may admit the statements subject to being connected up." *Id.* at 582. *Fourth,* although allowing the hearsay declarations to be admitted following or during the Government's case in chief upon a showing of "substantial, independent evidence" the Court required that "[r]egardless of whether the proof has been made in the preferred order, or the coconspirator's statement has been admitted subject to later connection, on appropriate motion at the conclusion of all the evidence the [district] court must determine as a factual matter whether the prosecution has shown by a *preponderance of the evidence independent of the statement itself* (1) that a conspiracy existed, (2) that the coconspirator and the defendant against whom the coconspirator's statement is offered were members of the conspiracy, and (3) that the statement was made during

---

1. By "substantial, independent evidence" we mean more than a scintilla. It is such evidence as a reasonable mind would accept as adequate to support a conclusion. Substantial evidence is less than the weight of the evidence. The possibility of drawing two inconsistent conclusions from the evidence, however, does not prevent the existence of the requisite elements from being supported by substantial evidence.

the course and in furtherance of the conspiracy." [Emphasis supplied]. *Id.* at 582.[2]

Should the district court conclude, at this stage of the proceedings, that the prosecution has not borne its burden of proof on these issues, the statement is not admissible in evidence. Thus, the court must then decide whether the erroneous admission can be cured by a limiting or cautionary instruction or whether a mistrial is required.

We are of the view that this procedure presents a workable solution to a difficult problem. It draws a delicate line between allowing the Government sufficient leeway to properly present its case while at the same time preventing the inherent danger of prejudice to a defendant which would result should a jury consider hearsay statements which lack adequate guarantees of trustworthiness.

█ Applying the standards announced in *United States v. Andrews, supra,* we have carefully searched the record as to each of the complaining Defendants. Even though we hold that *Andrews* is not to be applied retroactively, our assessment of the evidence presented in this case is such as to lead us to conclude that there was a preponderance of independent evidence that the conspiracy existed, that each of the Appellants was a member of that conspiracy, and that the statements offered against them were in furtherance of the conspiracy. Thus, even under our *Andrews* standard, we must uphold the admissibility of such statements.

### The Motions for Severance

Appellants Balloue, Carlson, Igo, Leonhardt, Malone, Miller, Dee Mitchell and Joel Mitchell all contend that the District Court abused its discretion in failing to grant their motions for relief from prejudicial joinder. We do not agree.

█ It is axiomatic that defendants may be charged jointly in the same indictment where they are alleged to have participated in the same act or series of transac-

tions. Rule 8(b), Fed.Rules Crim.Proc., 18 U.S.C. Defendants charged jointly in such indictments "are not entitled to separate trials as a matter of right." *Bailey v. United States,* 410 F.2d 1209 (10th Cir. 1969) *cert. denied sub nom., Freeman v. United States,* 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232 (1969). If prejudice either to the Government or a particular defendant is shown by the joinder, the court may, in its discretion, "grant a severance of defendants or provide whatever other relief justice requires." Rule 14, Fed.Rules Crim.Proc., 18 U.S.C. In determining the merits of a motion for severance, the trial court must weigh the prejudice to a particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration. *United States v. Walton,* 552 F.2d 1354 (10th Cir. 1977), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977). Inasmuch as severance is a matter of discretion and not of right, the defendant must bear a heavy burden of showing real prejudice to his case. *United States v. Parnell, supra; United States v. Ready,* 574 F.2d 1009 (10th Cir. 1978). A decision to deny separate trials under Rule 14 will not be disturbed on appeal in the absence of an abuse of discretion. *United States v. Eaton,* 485 F.2d 102 (10th Cir. 1973). The "unsavory reputation of one's co-defendants is not, per se, a ground for severance of defendants for trial . . . To establish abuse of discretion more is required than that separate trials might have offered a better chance for acquittal of one or more of the accused." *United States v. Knowles,* 572 F.2d 267 (10th Cir. 1978). Rather, it must be shown that the joinder of either defendants or offenses causes actual or threatened deprivation to an individual's right to fair trial. *United States v. Butler, supra.* Of course, a trial court has a continuing duty to insure that prejudice does not occur, and if it does, to sever defendants or offenses. *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960).

2. The district court, in our view, should make an explicit determination for the record regarding the admissibility of the statements as to each defendant challenging their introduction.

We were faced with arguments similar to those presented in *United States v. Beathune,* 527 F.2d 696 (10th Cir. 1975), *cert. denied* 425 U.S. 996, 96 S.Ct. 211, 48 L.Ed.2d 821 (1976). In *Beathune* we stated:

Fed.R.Crim.P. 8(b) provides that two or more defendants may be charged in the same indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. The charge in the instant indictment, as well as the Government's evidence in support of such charge, indicated that Rhodes and Beathune were acting hand-in-glove in an interstate stolen car ring, with Rhodes, as well as others, driving the stolen vehicles cross-country in interstate commerce and selling them to Beathune, who then sold the cars to purchasers in the Metropolitan Denver area. Under Fed.R.Crim.P. 14 a motion for severance is addressed to the sound discretion of the trial court, and in the instant case we find no abuse of discretion.

*United States v. Beathune, supra,* at 698–699.

Similarly, in the instant case, we find no abuse of discretion. While the evidence as to each complaining Appellant's involvement varies, the record supports the conclusion that they were all members of one conspiracy and, as such, the acts of one were attributable to the others. In *United States v. Riebold,* 557 F.2d 697 (10th Cir. 1977), *cert. denied,* 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977), we stated that "[m]utual participation of defendants in an offense or series of offenses is considered a logical, basic ground for refusing to grant a motion to sever." We observe that the District Court, in the instant case, severed the substantive offenses from the conspiracy charge prior to trial. Moreover, the Court was extremely cognizant of the problems presented in multi-defendant trials and so instructed the Jury throughout the case until its conclusion. In essence, we hold that the District Court fulfilled its "continuing duty" to assure that prejudice would not occur.

We observe that had this case been tried under the standards announced in *United States v. Andrews, supra,* the reasons for severance would not have been as strong inasmuch as the Jury would not have been required to determine the admissibility of co-conspirator's statements as to each individual Defendant.

Appellant Igo advances an interesting argument in support of his contention that the District Court erred in denying his motion for severance. He argues, in essence, that he "was placed in a 'damned if you do, damned if you don't' situation by the Jury's request, at the end of the second day of deliberation, for the transcript of Ronald Adams' testimony about [Igo]." [Brief of Appellant Igo at p. 21]. The requested testimony concerning Igo's participation in the conspiracy also contained damaging references to another Defendant in the case—Richard Taylor. Following the request of the Jury, the Court suggested to counsel that they discuss the request and attempt to reach a decision. [R., Vol. XXVI, pp. 5–6]. Such a decision was subsequently reached among interested counsel to the effect that the Jury not be allowed to review the transcript. Following this decision, the Court advised counsel on the record that he would be informing the Jury that "counsel would prefer that the transcript not be given . . . [and that] . . . there would be so much of the testimony [which] would have to be excised that we feel it would not be a meaningful thing to do, and might be an unfair emphasis." [R., Vol. XXVII, p. 2]. Counsel for Appellant Igo then stated "I would be most pleased with that. The situation, I don't think, can be handled in any other way." [R., Vol. XXVII, p. 2]. All counsel agreed and the Jury was so instructed. [R., Vol. XXVII, pp. 2–3].

In view of these circumstances, we hold that the District Court did not commit error in refusing to sever, *sua sponte,* Igo from the trial of the remaining Defendants. In any event, a "party may not sit idly by at trial watching error being committed,

and complain for the first time on appeal." *United States v. Hubbard, supra*, at p. 142.

### Miscellaneous Arguments

█ Appellant Joe Wilson contends the District Court erred in failing to suppress evidence obtained by law enforcement officers in Texas as a result of one or more searches of his place of business, Wichita Auto Salvage. The Government sought to justify the searches on the grounds that they were made pursuant to Texas statutory authority and with the consent of those in charge of the salvage yard. Following the testimony of several witnesses, at the motion to suppress hearing, the Court was initially of the view that the Government had failed to establish consent. The Court granted the Government the choice of presenting more evidence at a later date, or, in the alternative, accepting a ruling that day adverse to the Government's position. Subsequently, however, in an order dated April 17, 1978, the Court denied the motion relying primarily upon *United States v. Shields*, 573 F.2d 18 (10th Cir. 1978). During trial, counsel for Appellant Wilson again renewed the motion to suppress. It was denied by the District Court. We hold that the District Court did not err in denying the motion to suppress. *See: Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Shields, supra*.

█ Appellant Balloue argues that the application of the Jencks Act, 18 U.S.C. § 3500, denied him effective assistance of counsel in that "it is difficult to formulate strategy when none of the government's witnesses, or their testimony is disclosed in advanced (sic), when there are more than 75 witnesses called, and when there are 18 defendants in the courtroom." [Brief of Appellant Balloue at p. 24]. Appellant Balloue's argument is anchored to the Sixth Amendment of the United States Constitution.

While we find Appellant Balloue's argument novel and interesting, we cannot hold that the application of the Jencks Act denied Balloue effective assistance of counsel. This case, while complex, was not so difficult as to call into question the constitutional dimensions of the Sixth Amendment concerning the material sought.

█ Objection is also made to the District Court's admission in evidence of certain testimony which tended to show participation in other criminal activity. Appellants Balloue, Igo, and Petersen's contentions are foreclosed by Federal Rule of Evidence 404(b), 28 U.S.C. The incidents introduced at trial were clearly within the purview of that particular section.

█ The assertion of Appellant Dixon that venue was not properly laid in the District of Colorado as to his participation in the conspiracy is not well founded. It is settled that "venue as to prosecution of all members of a conspiracy lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." *United States v. Overshon*, 494 F.2d 894 (8th Cir. 1974), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). The existence of the conspiracy was adequately established by the Government. Appellant Dixon was shown to have been a member of the conspiracy and overt acts in furtherance of the conspiracy were committed within the State of Colorado.

The remaining allegations of error on behalf of all Appellants have been considered. We find that they are, individually and collectively, without merit.

WE AFFIRM.

McKAY, Circuit Judge, dissenting:

At least three separate reasons dictate that some or all of these cases should be reversed. These cases represent the application to separate conspiracies of the "chain conspiracy" doctrine developed for drug cases, a practice condemned by both the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) and this court in *United States v. Butler*, 494 F.2d 1246 (10th Cir. 1974). In

addition, I have considerable doubts about the sufficiency of the evidence.[1] However, because the use of an improper standard for determining the admissibility of co-conspirator statements here so clearly dictates reversal, these other issues need not be treated in this opinion.

This court properly determined in *United States v. Andrews*, 585 F.2d 961 (10th Cir. 1978), that the Federal Rules of Evidence (enacted before the trial of this case) requires a trial judge to find three facts by a preponderance of the evidence before admitting the hearsay statements of co-conspirators. He must determine that the conspiracy existed, that the declarant and the particular defendant were members of the conspiracy, and that the statement was made during the course of and in furtherance of the conspiracy. In these cases, however, the trial judge used a prima facie standard which may well have resulted in the pyramiding of otherwise inadmissible evidence.

Without even the benefit of briefing or oral argument, the majority has applied retroactivity analysis to an area where it decidedly does not belong. The doctrine developed by the majority results in a clear judicial usurpation of congressional prerogatives. The Federal Rules of Evidence is a *statute*, with a congressionally mandated effective date. In its analysis of Rules 104(a), 104(b), and 801(d)(2)(E), *Andrews* is purely a statutory interpretation case, as the majority acknowledges. *See* majority opinion at 1328, 1329. *Andrews* "was not based on constitutional grounds; rather it was premised on the proposition that the recently adopted Federal Rules of Evidence altered the procedural requirements in this area." Majority opinion at 1328. Nonetheless, according to the majority, the *Chev-*

*ron Oil* requirement is satisfied: "[T]he decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed." *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). *Andrews* did not overrule past precedent; the Federal Rules of Evidence did.

The majority opinion appears to have at its core an outmoded jurisprudential view that statutes do not become law until a court ratifies them. *See, e. g.*, J. C. Gray, *The Nature and Sources of the Law* (1909). I suspect that the majority's view is limited by the facts to conspiracy cases. If we had before us a conviction under a previously unconsidered criminal statute, I cannot seriously believe that this court would apply the same retroactivity analysis. But in order to affirm convictions, some of which are supported by only the most tenuous evidence, the majority here takes upon itself the amendment of a statutory effective date. When Congress has mandated change, we are not permitted to rely on "our view . . . that the prior procedures sufficiently protected defendants from the dangers inherent in the admission of co-conspirator hearsay statements." Majority opinion at 1329.

The defective standard used by the trial court, and approved by this court, is not saved by the majority's reanalysis of the evidence to find the critical facts by "a preponderance of independent evidence." Majority opinion at 1331. We may not, as an appellate court, constitutionally find facts which flow from disputed evidence and which result in a criminal conviction. The function of determining evidentiary ad-

---

1. Even the trial judge seemed to have serious doubts with respect to defendant Leonhardt, but he inexplicably failed to grant the motion for judgment of acquittal. At the sentencing the court urged Leonhardt to appeal because "[t]he case against you . . . is very thin. I let it go to the jury because I thought there was barely enough evidence to get to the jury,

. . . but I may have very well been wrong on that." Record, vol. 28, at 40. The court further urged the filing of a Fed.R.Crim.P. 35 motion for reduction of sentence "which I assure you I will consider very, very carefully in the event that [the conviction is] affirmed." Record, vol. 28, at 40.

missibility belongs to the trial court apply-
ing legally mandated standards.[2]

---

**2.** The delicacy of the fact-finding function in these cases is emphasized by the lengthy consideration the majority necessarily gives to the sufficiency of the evidence claims. In making its determinations of sufficiency, however, the majority might well have used some evidence that, under a proper *Andrews* standard, should not have been before the court at all.