**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Henry Anselmo GUTIERREZ and
Edward Joseph Zamora,
Defendants-Appellants.**

**Nos. 77–1304 and 77–1305.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted April 29, 1978.

Decided May 4, 1978.

Rehearing Denied in No. 77–1304
June 30, 1978.

Richard N. Stuckey, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., on brief), for plaintiff-appellee.

William L. Keating of Fogel, Keating & Wagner, Denver, Colo. (George F. Martens, Denver, Colo., on brief), for defendant-appellant Gutierrez.

Kevin P. Kubie, Denver, Colo., for defendant-appellant Zamora.

Before BARRETT, DOYLE and LOGAN, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The Gutierrez appeal, No. 77–1304.

Gutierrez and Zamora, defendants-appellants herein, seek reversal of judgments of conviction resulting from jury verdicts of guilty based on an indictment which charged that they, together with others, did knowingly and willfully conspire to commit offenses against the United States, arising under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, the purpose of the conspiracy being to knowingly and intentionally distribute quantities of a Schedule I narcotics controlled substance—heroin.

In Counts IV and V Gutierrez was charged, together with others, with knowingly and intentionally distributing a controlled substance, approximately five ounces of heroin, a Schedule I narcotic controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Gutierrez was found guilty of violating Count V. He was found not guilty as to Count IV.

Other alleged co-conspirators were Edward Joseph Zamora, who also seeks review and reversal of his conviction under the conspiracy count, Anthony L. Murillo, Mose Anthony Trujillo, James Orlando Quintana and Isaac Abram Ruybalid. Of these, Zamora alone has appealed.

Neither of the defendants-appellants nor any of their co-conspirators testified at trial.

The dates set forth in the conspiracy count of the indictment span the period from May 1976 to October 6, 1976. The substantive offense in which Gutierrez is charged, namely Count V, is alleged to have occurred on September 29, 1976. This was a transaction in which Gutierrez actively took part.

The points which are advanced by Gutierrez are, *first*, that the evidence was insufficient to establish his participation in the conspiracy. His more specific complaint is that the proof was insufficient to establish that he was engaged in a conspiracy with the individuals whose statements inculpatory of Gutierrez were offered and received in evidence. He claims that these statements are hearsay and incompetent.

One of the major questions in the case is the adequacy of basic proof to establish that the relationship between Gutierrez and the pushers or sellers of the narcotic was such that the statements of the latter such as Murillo and Ruybalid made to undercover agent Vigil were binding on Gutierrez.

A second point on behalf of Gutierrez involves the admission into evidence of certain exhibits, samples of heroin, which were purchased by government agents from Murillo, Ruybalid, Vigil (not the agent) and others. The objection here is that the time lag between the purchase of the samples and the testing was substantial and that there was a failure of proof as to safeguards in storing or keeping safe.

Gutierrez also objects to the receiving in evidence of the testimony of Agent Duran regarding the organizational scheme of narcotics trafficking rings and the specific positions of Gutierrez and Zamora in such an operation.

Gutierrez further challenges the receipt in evidence of a cashier's check purchased from a local bank by one Henry A. Gutierrez in the amount of $20,000. The purpose of this being offered and its being received in evidence is to show that appellant Guti-

errez sent this check to a town in Mexico in order to pay for heroin which was purchased in that particular town. It is claimed that the check was proven up incompetent because appellant Gutierrez was not identified as the purchaser, and also this evidence was not developed until just a few days prior to trial. The potentially meritorious question is, however, whether the check was adequately authenticated.

The questions tendered on behalf of Zamora are, *first,* whether the evidence as to Zamora's participation in the conspiracy was sufficient to support the jury's verdict and, *secondly,* whether the court abused its discretion by allowing the narration by the Agent Duran of certain videotape evidence having to do with his monitoring the delivery of heroin. (In the course of his monitoring, the agent identified Zamora as being in the near vicinity of the dropped heroin and also depicted him as protecting the heroin which had been dropped previously.)

I.

## WAS THE EVIDENCE SUFFICIENT TO JUSTIFY THE GUILTY VERDICT AGAINST GUTIERREZ IN THE CONSPIRACY CASE?

We hold that it was. It is to be noted that the alleged conspiracy extends to a number of individuals, including James Quintana and Isaac Ruybalid, both of whom are at large. Anthony Murillo and Mose Trujillo have entered guilty pleas on counts other than those connected with Gutierrez and the appellant Edward Joseph Zamora.

Much of the government's evidence was presented through undercover agent Michael Vigil, who made several purchases from Anthony Murillo and Isaac Ruybalid. Undercover agent Vigil also had dealings with Fidel Ramos and Sye Vigil.

On July 9, 1976, Vigil purchased one-half ounce of heroin from Anthony Murillo and Mose Trujillo.

On July 12, 1976, agent Vigil purchased one ounce of heroin from Anthony Murillo.

On July 17, 1976, Vigil purchased five ounces of heroin from Anthony Murillo. Following this sale, Ruybalid and Quintana were seen by the surveillance officers in the company of Anthony Murillo and were observed counting a substantial quantity of money.

On July 22, 1976, agent Vigil purchased eight ounces of heroin from Anthony Murillo.

On July 31, 1976, Vigil purchased one ounce of heroin from Anthony Murillo.

Counsel for Gutierrez emphasize that he was not involved in any direct dealings, although they concede that his alleged co-conspirators, pushers or sellers, identified to Vigil appellants Gutierrez and Quintana as the source of the heroin.

Vigil testified that on August 19 and 20, he met with Ruybalid, and on August 25, 1976, he purchased one ounce of heroin from Ruybalid.

On August 26, 1976, he purchased two ounces of heroin from Ruybalid.

On September 3, 1976, he purchased one ounce of heroin from Ruybalid. He was told by the latter that Edward Joseph Zamora was the source of this heroin.

Agent Vigil observed Ruybalid meeting with Zamora contemporaneously with the August 26, 1976 and September 3, 1976 purchases. He also saw him meeting with Zamora on September 7, 1976, when Ruybalid sold one ounce of heroin to Vigil.

The several samples of heroin sold to Vigil on the various dates mentioned above were admitted into evidence.

Both Murillo and Ruybalid, according to agent Vigil, repeatedly identified Quintana and Gutierrez. They were said by the sellers to be the source of their supply of heroin. Also, it was Murillo who introduced Ruybalid to Vigil on August 20, 1976. Ruybalid stated that Quintana and Gutierrez were his *partners.* Also, Vigil had observed Ruybalid on August 21, 1976 driving a 1975 Pontiac Grand Prix, which he had seen Henry Gutierrez driving on numerous occasions and which he had observed in the vicinity of Henry Gutierrez's residence at

375 Meade Street, Denver. Ruybalid stated that he had been loaned this car by one of his partners and that this car was used in their business.

■ There is one significant transaction (from the standpoint of proof of the conspiracy) in which Quintana and Gutierrez were involved. That commenced on August 23, 1976, at a tavern. Vigil actually met Quintana and Gutierrez and these men questioned Vigil about his contacts in New Mexico and other information designed to check his authenticity as a buyer of heroin. Following his discussions with Gutierrez and Quintana, Ruybalid said that his partners had given him permission to go ahead with the proposed heroin transaction with Vigil. We view this conversation between Quintana, Gutierrez and Vigil and the statement by Ruybalid to Vigil concerning going ahead with the transaction as part of a single transaction. Thus, the statement of Ruybalid that he had been told to go ahead with the transaction with Vigil is part of the *res gestae* and thus it is not necessary to rely on statements of co-conspirators in order for this evidence to be received. Rule 803(1) and (2), Rules of Evidence.

Two days after this incident, Vigil met with Ruybalid and completed a purchase of heroin. On the day of the transaction in question, Gutierrez was observed by a government agent going to Ruybalid's home as part of the transaction.

There is a sale involving Quintana and Gutierrez during this same period. On September 23, 1976, Vigil talked with Ruybalid about the transfer of some stolen diamond rings for heroin. A meeting was arranged between Vigil, Quintana and Ruybalid at Gutierrez's residence. Vigil offered to trade the diamonds for heroin, but Gutierrez refused to do so because they were too small. Quintana also refused to accept the rings because of the diamonds' lack of value. However, there was a continuation of this transaction on September 28, 1978, when Vigil contacted Ruybalid again about the diamond ring transaction. The diamonds were displayed on the September 28,

1976 occasion, but Quintana was not present, and Gutierrez said that Quintana would have to look at the diamonds and determine what quantity of heroin would be given for them.

The next day, September 29, 1976, according to Vigil, he, in the company of Ruybalid, went to 1326 Kalamath Street, the home of Quintana's parents, and there met Quintana and Gutierrez in an attempt to complete the heroin-diamond transaction. Both Quintana and Gutierrez, together with Ruybalid, and also the diamonds, were present at this Kalamath Street meeting. Gutierrez then examined the diamonds with the jeweler's glass and a measuring instrument. Gutierrez was told that the diamonds had been removed from the original mountings. Quintana also examined them. While looking at the diamonds, Gutierrez asked whether the diamonds had been removed from the mountings and Vigil said "yes," so that they would be difficult to identify. Quintana asked if the diamonds were from New Mexico, and Vigil said "yes." There was a good deal of conversation with Quintana as to the value of the diamonds. Quintana finally said, according to Vigil, that 15 ounces of heroin would be given for the diamonds plus $10,000 in cash. The diamonds were handed to James Quintana. Later Vigil met Ruybalid at a bar and went from there to some apartments in West Denver. Ruybalid said that he had the heroin and he was ready to complete the transaction. Ruybalid said that Quintana and Gutierrez had liked the diamonds and that Quintana had kept four and give Gutierrez one. The heroin was delivered and the money was passed.

On October 6, an effort was made to purchase two pounds of heroin from Ruybalid for $24,500. The money was actually shown to Ruybalid, but this transaction was not completed.

■ The presence of Gutierrez during at least part of the conversations which were had in connection with the trade of diamond rings for heroin, together with the fact that the transaction was completed, unquestionably serves to identify Gutierrez

as a member of the conspiracy for the purpose at least of the receipt of statements of Murillo and Ruybalid. The meeting a few days prior to that at the bar with Gutierrez and Quintana and the detailed discussions as to Vigil's personal connections, followed by the fact that Ruybalid completed the transaction and said immediately after in private discussions with Gutierrez and Quintana that they, as his partners, had given him permission to proceed, supports the proposition that Gutierrez belonged to the conspiracy so as to justify the court's allowing the jury to consider the extrajudicial statements of Ruybalid and Murillo. Also, the testimony of the agents who had Gutierrez under surveillance furnished circumstantial evidence of his membership, as does the evidence that his automobile was used in the transaction of business on behalf of the conspiracy.

The prior statements by a witness are admissible and are said not to be hearsay in § 801 of the Rules of Evidence. That section (Rule 801(d)(2)), provides in pertinent part:

> (d) Statements which are not hearsay. A statement is not hearsay if—
> (2) Admission by party-opponent. The statement is offered against a party and is * * * (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

■ The more frequent application of this rule is in relationship to a co-conspirator. The declaration of one during the period when the conspiracy is going on is admissible against another co-conspirator provided there is sufficient showing by independent evidence of a conspiracy between the declarant and one or more other defendants, and the declaration is made in furtherance of the conspiracy. *See United States v. Pennett*, 496 F.2d 293 (10th Cir.

1974). Unquestionably, the statements here were made in furtherance of the conspiracy and the only problem is whether there is adequate independent evidence for the existence of a conspiracy between the declarant and the defendant. We have concluded that there is "substantial, independent evidence of the conspiracy at least enough to take the question to the jury." *United States v. Nixon*, 418 U.S. 683, 701 at n. 14; 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

There was sufficient independent evidence of the existence of a relationship, whether you call it co-conspirator, agency or partnership, so that statements made by Murillo and Ruybalid were admissible against Gutierrez. *See United States v. Krohn*, 573 F.2d 1382 (10th Cir., filed April 3, 1978).

## II.

### WAS IT ERROR FOR THE COURT TO RECEIVE THE SAMPLES OF HEROIN WHICH WERE PURCHASED BY VIGIL FROM MURILLO AND RUYBALID?

■ We conclude that it was not error. Here, as in connection with the extrajudicial statements made by the agents to Vigil, the question is whether in making the sales reflected by the samples the sellers were acting on behalf of Gutierrez, so it is a matter of whether the evidence supports a conclusion that these men were agents or partners, as was claimed by Ruybalid of Gutierrez. Having concluded that this was a heroin enterprise which supplied a great amount of the drug and that Quintana and Gutierrez were the leaders of it, it would follow pretty much axiomatically that the sellers were acting on behalf of these two. There is specific evidence in the form of meetings between Gutierrez, Quintana, Vigil and Ruybalid, the latter who was introduced to Vigil by Murillo, that this involved a relationship or partnership in crime or an agency or conspiracy, so that the sales were on behalf of Gutierrez (and Quintana). Once you conclude, of course, that there was such a relationship, the

statements of the agents are admissible for the purpose of corroborating the existence of the conspiracy and for the purpose of proving the substantive offenses charged.

■ It is also claimed by the defendants that the subject exhibits, samples of heroin purchased by undercover agents and subsequently tested at the DEA laboratory in Dallas, Texas, were inadmissible because the testing was delayed seven to 49 days after mailing from Denver. Objection is also registered as to the failure to show the procedures used for safekeeping or for storage of the evidence. Also claimed is a lack of evidence to show a chain of custody.

There is no claim of tampering nor is there any evidence that raises a real question about whether the drugs were mailed directly to the testing laboratory. Nor is there shown a break in the chain of custody. Hence, we see no basis for this objection.

As was said in *United States v. Freeman*, 412 F.2d 1181, at 1182–83 (10th Cir. 1969):

> The matters relating to the chain of possession of the tablets from agent Bullock to the chemist and back relate only to the weight to be given the testimony of the chemist. In the final analysis, the verdict depended on whether the jury believed agent Bullock or the defendant.

## III.

WHETHER THE COURT ERRED IN ALLOWING THE TESTIMONY OF AGENT DURAN IN RESPECT TO THE ORGANIZATIONAL SCHEME OF A NARCOTICS TRAFFICKING RING, INCLUDING HIS OPINIONS AS TO THE POSITIONS OF GUTIERREZ AND ZAMORA IN THE OPERATION.

■ At first glance, the point here advanced was a cause of concern to us because it came through as a situation in which a witness had been allowed to testify to conclusory matters approaching the giving of opinions as to guilt or innocence. Further examination, however, revealed that the witness Alejandro Duran, a DEA agent, had been called by the government for the limited purpose of describing his participation in investigative surveillance of appel-

lants and their co-conspirators. It was on cross-examination that counsel for Gutierrez asked Duran numerous detailed questions, first, regarding the organizational structure of the DEA and then the meaning of various terminology used by narcotics violators. Indeed, he was asked questions about heroin rings, including the one in the case at bar. He was even asked about the personnel and leadership. This was an apparent effort by defense counsel to establish that the members of the DEA group believed in the guilt of the defendants and were thus prejudiced. It was only after this testimony that clarifying questions were asked by the government. Duran testified to his qualifications as an agent and he went on to state that it was not unusual for the leaders of a drug ring to insulate themselves from direct contact with the sale of narcotics. He characterized Gutierrez as a leader of the ring and Zamora as a "drop man."

Were it not for the fact that the defendant by cross-examination expanded the scope of the testimony of the witness Duran, we would have to conclude that the questions asked and answers given were prejudicial, for it is not permissible to have a witness comment on the testimony or to give conclusions which result in testifying as to the ultimate questions which the jury is called upon to answer.

It is true that Rule 704, the relevant Rule of Evidence, does recognize that on occasion the ultimate issue to be decided by the jury can be touched by opinion evidence. Caution should be the watchword in receiving such evidence in criminal cases. The extraordinary circumstances shown here persuade us that receipt of this testimony was not prejudicial.

## IV.

DID THE TRIAL COURT ERR IN RECEIVING IN EVIDENCE A CASHIER'S CHECK IN THE AMOUNT OF $20,000, PURCHASED FROM A LOCAL BANK BY ONE HENRY A. GUTIERREZ?

A few days before the trial was to begin, the government notified defense counsel

that a cashier's check in the amount of $20,000, together with a cashier's check request, had come to its attention. This check had been drawn on a Denver bank and was purchased by Henry A. Gutierrez. The check was made payable to Margarita Sandoval in Culiacan, Mexico. Appellant Gutierrez stated at the time that he would object to receipt in evidence of this check on the ground of lateness and relevancy. The trial court denied the pretrial request for continuance, but reserved a ruling as to admissibility until the evidence was offered at trial.

A *voir dire* hearing was held in chambers. It established that the check had been purchased by two men, one of whom identified himself as Henry Gutierrez. The teller who prepared the check was unable to positively identify the appellant Gutierrez as the purchaser of the check. She testified, however, that the purchaser was polite, well groomed, and wore "very pretty" gold rings. The check was paid through regular banking channels and records of the transaction were kept in accordance with standard banking practice.

■■ The question of authentication of this check is somewhat difficult because there is not a positive identification of the purchaser, so we start out with the suspicious circumstance that the check was purchased by a Henry A. Gutierrez in company with another man. It is not, of course, essential that there be positive evidence in every instance in order to authenticate a document such as the cashier's check which we have before us. It can be accomplished by circumstances. The fact that the name is the same as that of the defendant-appellant would not be sufficient in itself. Yet it is a factor when considered in conjunction with the fact that Ruybalid told Vigil on a number of occasions that the source of the heroin which was being furnished to him was in Culiacan, Mexico, the place where the check was sent. Ruybalid also told Vigil that Quintana would usually send Gutierrez to pick up the narcotics at Culiacan, Mexico. It is not, of course, a daily occurrence to have a cashier's check of the mag-

nitude sent to Culiacan, Mexico, by a person having an unusual name like Henry A. Gutierrez. Moreover, we cannot disregard the fact that Gutierrez by now has been proven to be a senior partner in this narcotics enterprise. All in all, we would say that the trial court acted within its discretion in receiving the evidence.

■ The question remains whether the check was relevant. Here the totality of the evidence with respect to the magnitude of this enterprise, including the evidence that the heroin came from Mexico, justified the receipt in evidence of the check as bearing on the question whether Gutierrez was guilty of conspiracy by paying the purchase price for the heroin.

Federal Rules of Evidence, Rule 901(b)(4), authentication, or identification looking to admissibility, is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Illustrations are given in subsection (b) in Rule 901, including "appearance, content, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

The action of the trial court in receiving this document was within both the letter and the spirit of this rule.

### V.

DID THE COURT ERR IN DENYING GUTIERREZ'S MOTION FOR SEVERANCE FROM ZAMORA, WHICH MOTION WAS TENDERED ON THE MORNING OF TRIAL?

■ In support of his severance request, the argument was made that Zamora, if severance were allowed, would testify in favor of Gutierrez. He says that severance was mandatory because it was impossible for him to receive a fair trial without Zamora's testimony. The problem with this is that no positive assurance was or could be given that Zamora would have testified. In any event, the question is whether or not failure to grant the severance will result in prejudicial testimony against one defendant which is inadmissible against the joint de-

fendant, here Gutierrez. Is it prejudicial to the point that it requires that the case be severed?

Rule 14 of the Federal Rules of Criminal Procedure answers this question. It provides that:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

This ordinarily contemplates the positive evidence against one defendant which is prejudicial to the other.

Defendant seeks to turn this around so as to grant a severance in order to free the codefendant to testify favorably toward him. The answer to this is that he is free to testify favorably in an exculpatory way in the joint trial if he chooses to do so. Therefore, we fail to perceive prejudice.

A further reason for upholding the trial court in this ruling, in addition to the fact that Zamora's testimony was the merest of possibilities, was the fact that Zamora would either have to be convicted or acquitted first in order to be free to exculpate Gutierrez. If Gutierrez were to be tried first in a severance situation, it would be impossible for Zamora to testify without inserting his own head into the noose.

\* \* \* \* \* \*

In sum, the testimony in support of the convictions of Gutierrez was more than sufficient despite the fact that only a small part of it was direct evidence. The circumstances, however, were extensive and supportive.

As to the trial rulings, with the exceptions noted, the trial was virtually errorless. As to the rulings of which we have shown some disagreement, we do not agree with defendant Gutierrez that they were prejudicial.

The Zamora appeal, No. 77–1305.

The Zamora case is different from the Gutierrez case in that Zamora, according to the government's theory, occupied a different position in the enterprise. The government's evidence shows that he made deliveries or "drops," as they are called. Also, he would remain until the delivery was completed. The Zamora case also differs in that there is a comparative dearth of evidence showing Zamora's direct participation in sales. There was evidence produced by videotape which showed him to be at or near the scene of the delivery of heroin.

I.

■ The main question as to Zamora is then whether the evidence was legally sufficient to establish that he was part of the conspiracy.

Zamora was identified with some of the same series of sales that we have already considered. On July 31, 1976, Vigil purchased an ounce of heroin for $1,000 from Murillo. The transaction occurred near Sloan's Lake in Denver and was observed by surveillance officers. Prior thereto, Ruybalid drove to 1339 Knox Court, the residence of Edward Zamora, and then met Murillo near Zamora's home. Soon thereafter, Zamora approached the Murillo truck, placed his right hand on the passenger window and walked around the truck and entered the Ruybalid car. This was shown to the jury by videotape. After this, Zamora and Ruybalid drove away. Vigil took delivery of the heroin at Sloan's Lake.

In late August 1976, Vigil was introduced (as we have previously noted) to Ruybalid. Ruybalid was the one, it will be remembered, who introduced Vigil to Quintana and Gutierrez. In connection with the discussion of drug transactions, Ruybalid told Vigil that he disliked any direct connection with heroin. He said that his partners had taught him well on this. He explained that a person by the name of "Eddie" made the actual deliveries of heroin for him as a "drop man." Vigil testified that Eddie was in fact Zamora.

It was Ruybalid's practice to place the agreed quantity of heroin at a certain location for pickup later by the purchaser. On September 3, 1976, following the negotiations which preceded a delivery, Vigil was riding with Ruybalid in the latter's automobile to pick up the heroin that he had purchased. As they reached the vicinity of the pre-arranged drop location, Vigil saw Zamora standing across a gully by his, Zamora's automobile. He was waving his arms at them. Ruybalid stopped his car and told Vigil that the heroin should have been placed near Zamora's location, but the presence of two teenage boys in the immediate area might be the reason for its not being there. At this time Ruybalid and Zamora entered their vehicles. Ruybalid drove a short distance to where Zamora was parked and they both left their vehicles and had a conversation. When Ruybalid returned he told Vigil that the person in the other vehicle worked for him and had placed the heroin at that location earlier. Two teenagers had seen him, had picked up the package and had run away with it. Zamora recovered the heroin after a chase, and eventually Ruybalid made the actual delivery of heroin directly to Vigil. Most of this episode, including Zamora's actions, were recorded on the videotape and was shown at the trial.

The surveillance agents testified that on at least two additional occasions Zamora was seen in the immediate vicinity of heroin drops just before the transfer was to be made. On these occasions he promptly departed the area once the pickup was completed. In addition, Zamora was frequently seen meeting with Ruybalid and other conspirators both before and after heroin transactions were completed.

Zamora contends that the inculpatory statement by Ruybalid regarding his being a "drop man" was actually inadmissible in the absence of solid proof that a conspiracy existed. He contends that the evidence against him consists of his being merely present at the scene of the crime. We must disagree. There was much more than mere presence. In many, if not all of the transactions, a delivery was made in a similar way. It was in an empty cigarette package and it would be under some object such as a trash can. It is to be inferred that the reason for Zamora's remaining at the scene was to protect the material which he had placed for pickup. In connection with the transaction described above, he pursued some teenagers and recovered heroin which they had taken.

We are not saying that it is a powerful case. We are saying that the evidence is sufficient to justify the introduction of the extrajudicial statement of Ruybalid in explanation of Zamora's function.

## II.

■ The final point urged by counsel for Zamora is that the court erred in allowing agent Alejandro Duran to narrate the videotape of September 3, 1976. During the course of the trial the government was allowed to show several surveillance videotapes to the jury. Counsel stipulated to the admission of these and agreed to allow agent Duran to narrate the videotapes and explain to the jury when and where they were taken and to identify the people seen in the videotapes. It is claimed, however, with respect to the September 3, 1976 tape, that Duran was allowed to state more than counsel had agreed upon. He was allowed to give detailed descriptions of the events as they were happening. The record does not bear this out. In the few instances in which the narration exceeded the boundaries, the trial court took action to stop any expansion. We are unable to agree that the trial court abused its discretion or that defendant suffered prejudice.

The judgment as to Zamora is affirmed.