**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 1 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CECIL W. CHANDLER III,

    Defendant - Appellant.

No. 00-3130

(D. Kansas)

(D.C. No. CR-99-40044-01)

---

**ORDER AND JUDGMENT**[*]

---

Before **EBEL**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

---

Cecil W. Chandler III, was convicted following a jury trial on two counts of conspiracy to distribute in excess of 50 grams of cocaine base in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) and 18 U.S.C. § 2, and sentenced to concurrent terms of 360 months in prison on each count. On appeal, Defendant argues that: (1) a remark made by the district court disparaged his counsel to the point of denying him a fair trial; (2) the district court violated his right to confront his

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

accusers by curtailing his counsel's cross-examination of two key government witnesses and did so in a way that further denigrated his counsel before the jury thereby preventing him from receiving a fair trial; (3) the district court erred in admitting a photograph because it was more prejudicial than probative and contained a handwritten caption that was improperly authenticated; (4) a statement made by the prosecutor in his closing argument incited and inflamed the jury thereby denying him a fair trial; (5) the cumulative effect of the foregoing errors, even if harmless when considered individually, was to violate his right to a fair trial; (6) the evidence was insufficient to support his conviction, and, as a result, the district court's denial of his motion for acquittal on that basis was error; and (7) the district court erred in applying the 100:1 crack cocaine enhancement under U.S.S.G. §2D1.1(c) and the four level organizer/leader enhancement under U.S.S.G. §3B1.1(a) because the evidence did not support the application of either enhancement. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

## I. BACKGROUND

The defendant was indicted in a two count indictment on May 27, 1999. Count I charged him with conspiring with David Seabury from approximately January 1, 1997, to September 30, 1997, to distribute crack (the "Seabury

conspiracy"). Count II charged Defendant with conspiring with Ronnie Jones from approximately November 1, 1996, to May 31, 1997, to distribute crack (the "Jones conspiracy"). The evidence, when viewed in the light most favorable to the government,[1] establishes the following facts.

## A. The Seabury Conspiracy

Defendant sold crack for a living. R. Vol. III at 8. Seabury and Defendant began buying crack together in 1997. Id. at 8-9. Their first joint purchase occurred in January, 1997. Defendant arranged to meet the seller, a person unknown to Seabury, in a grocery story parking lot in Topeka, Kansas. Id. Seabury and Defendant then drove to Topeka, Kansas, where Defendant paged the seller. Id. at 10. When the seller approached their car, Seabury gave Defendant $500 which Defendant put together with his own $500 and handed to the seller in exchange for one ounce of crack. Id. at 10-11. After purchasing crack in Topeka, Defendant and Seabury divided it equally and then sold it separately. Id. at 12. Defendant had others sell his crack for him. Id. Specifically, Seabury saw Jermaine Archibald, a/k/a Bastard, sell drugs for Defendant. Id. at 14.

Defendant and Seabury made two additional joint purchases from the Topeka seller in the same manner. The second joint purchase of crack occurred in

---

[1]See United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999).

May 1997, and differed from the first only in that two ounces were purchased for $2000. The third and final joint purchase made by Seabury and Defendant took place in July 1997. That time, four ounces of crack were purchased for $4000. Seabury and Defendant had Seabury's mother rent cars for them, generally for one month at a time, which they used to drive to Topeka to buy crack and for other purposes. Id. at 63-65. Defendant and Seabury each paid half of the rental charge and they shared the use of the rental cars equally. Id.

During the period of time in which Defendant and Seabury were buying crack in Topeka, they spent a significant amount of time together and even jointly rented a home in Ogden, Kansas. Id. at 5-6. At trial, the government introduced a photograph of Defendant and Seabury in which Defendant is displaying a large amount of cash for the camera. See id. at 23-24, Govt's Ex. No. 2. Seabury confirmed that the money Defendant is holding in that photograph came from selling crack. Id.

## B. The Jones Conspiracy

In November 1996, Defendant approached Ronnie Jones about buying drugs. Id. at 132. Jones bought two ounces of crack from Defendant that month, and one ounce a month thereafter until May 1997. Id. at 132-36. In these purchases Jones acted as a middleman, purchasing the crack from Defendant for a

person named "Beedy-bump" Id. at 135. Beedy-bump gave Jones the money he used to make the purchases and paid him approximately $200 for completing each transaction.[2] Id. at 135-36.

## C. Other Evidence of the Charged Conspiracies

Jurlene Lucas a/k/a Jurlene Jackson, the mother of one of Defendant's girlfriends, heard Defendant discuss his sale of drugs numerous times during the nine years that she has known him. Id. at 78. In 1997, Defendant told Lucas that he was buying his crack cocaine in Topeka and also bragged that he had fifteen people working for him in his drug operation. Id. at 78-79. Lucas identified Keisha Green, Tamika Moore, a woman named "Lum," and Archibald as some of the people that worked in Defendant's drug ring. Id. at 80. She often saw Defendant with Seabury, and heard both Seabury and Archibald brag about selling drugs. Id. at 81.

Sometime during the summer of 1997, Defendant asked Lucas to keep $4000 for him. Id. at 77-78. In September of 1997, after he had retrieved the original $4000, Defendant asked Lucas to hold an additional $8,500 for him. Id.

---

[2]Defendant states in his brief that Jones had purchased crack in the past from Beedy-bump. Appellant's Br. at 28. Defendant misreads the trial testimony. Beedy-bump gave Jones money to buy crack from Defendant for him. When Jones states, "[a]t that time I was getting it from a guy named Beedy-bump," the "it" refers to the purchase money, not crack. R. Vol. III at 135.

at 86. Later, he asked her to hold another $3000. Id. at 89-90. Police eventually seized $10,960 of that money and found that most of it was in $20 bills. R. Vol. IV at 184.

At the time of the alleged conspiracies, crack was commonly sold in one-hit $20 pieces. Id. at 186, R. Vol. III at 18-19. Those one-hit pieces of crack are commonly packaged by dropping them in the corner of a sandwich baggie, tying a knot, and cutting the corner off above the knot. Id. at 12. Brandon Grubs, a police officer, found small empty plastic bags and $230 in cash in Defendant's shoes when he searched Defendant following his arrest in December of 1996. R. Vol. IV at 209. When Grubs asked him what the baggies were for, Defendant replied that sometimes his stuff is not packaged and he has to do it himself. Id.

In June 1998, police executed a search warrant at the home of Natasha Moore, Seabury's sister and another girlfriend of Defendant. Over $3000 worth of rental car agreements in Seabury's mother's name, from the first six months of 1997, were found. Id. at 198-99. One of the agreements listed Defendant as a driver and Defendant had been stopped by police in the rental car covered by that particular agreement. Id. at 199-200. Several letters from Defendant to Moore were also recovered. One of the letters contained a photograph of Defendant taken while he was incarcerated. The photograph shows Defendant in the center surrounded by approximately six other men. The handwritten caption on the

photo reads: "I keep a Firm no matter where I'm at, baby." Id. 200-04. Ron Espy, a police officer, stated that the handwritten caption appeared to match the handwriting of the other letters from Defendant to Moore which were recovered during the search. Id. at 200-01. Seabury, Lucas, and Espy all testified that Defendant referred to his drug distribution organization as "The Firm." Id. at 202-03, R. Vol. III at 22, 83.

In March or April of 1997, Defendant and Jones were both confined at the federal pretrial detention facility in Leavenworth, Kansas. Jones and Defendant had a conversation there in which Defendant told Jones that Archibald was running his drug business while he was incarcerated. Id. at 141-42. After Jones had stopped purchasing crack from Defendant, Jones saw Defendant packaging crack in August 1997 at his Ogden, Kansas, home. Id. at 136-37.

Jones and Seabury both claimed to be very familiar with the appearance of crack, Seabury claiming to have seen it over 500 times and Jones, over 100 times. Id. at 18, 138. Both Seabury and Jones testified that the substance purchased from and with Defendant was crack. Finally, in June 1997, during the period of the alleged Seabury Conspiracy, Defendant was arrested for possession of crack.

R. Vol. IV at 225-26. Defendant pled to possession of crack and a journal entry of his conviction was entered into evidence.[3] Id. at 226-28.

Seabury, Lucas and Jones all entered into agreements to testify with the federal prosecutor hoping to avoid indictment or to obtain lenient sentences.

## D. Sentencing

The district court's application of the 100:1 crack cocaine enhancement under U.S.S.G. §2D1.1(c)(2) together with the organizer/leader enhancement pursuant to U.S.S.G. §3B1.1(a) resulted in a total offense level of 40. The district court determined Defendant's criminal history category to be VI. The resulting guideline sentence range was 360 months to life imprisonment. Defendant was sentenced to concurrent terms of 360 months imprisonment and ten years supervised release on each count.

---

[3]It is not clear from the Record whether Defendant pled guilty or nolo contendere.

## II. DISCUSSION

### A. Alleged Judicial Misconduct

#### 1. The District Court's Statement

The district court was forced to delay the start of Defendant's trial because defense counsel was at another hearing in the same courthouse, and that hearing had run late. When defense counsel finally arrived, the district court stated:

> All right, the jurors are all present. Ladies and gentlemen, I apologize to you, I had no idea that hearing would last that long and I almost sent the U.S. Marshals to drag the attorney out, but I – I am disappointed. All right, I think we're ready to proceed. You may call your first witness.

R. Vol. III at 3. Defendant contends that this statement irreparably denigrated his counsel in the eyes of the jury and made it impossible for him to obtain a fair trial. Counsel, however, made no objection at the time.

Before we can correct an error not raised at trial, we must be satisfied that there was a plain error that affected Defendant's substantial rights. Johnson v. United States, 520 U.S. 461, 466-67 (1997). For an error to impact Defendant's substantial rights, "[i]t must have affected the outcome of the district court proceedings." United States v. Olano, 507 U.S. 725, 734 (1993). After reviewing the statement, we conclude that it does not even begin to approach the plain error threshold, or, for that matter, error under any other standard of review.

### 2. Limitation of Cross-Examination

The district court intervened during defense counsel's cross-examination of Seabury and Lucas. Defense counsel had asked Seabury repeatedly about a pro se motion he filed, each time getting the same response. When defense counsel began questioning Seabury about the matter again, the district court stated, "[w]ell, let's leave that. We've been with that – over that about six times. Move on to – something else." R. Vol. III at 60. In his cross-examination of Lucas, defense counsel was attempting to discover when she stopped using marijuana. Lucas responded three times to three different questions that she did not remember when she quit. When defense counsel began a fourth question again asking Lucas when she quit using marijuana, the district court intervened, stating, "[a]ccept her – she said she doesn't remember. Accept what she's saying." Id. at 120.

Defendant first claims that the district court used a "caustic" tone of voice during the interventions, the effect of which was to further denigrate his counsel in the eyes of the jury and further jeopardize his right to a fair trial. Appellant's Br. at 17-18. We disagree and conclude that the court's comments did not constitute error.

Defendant also argues that these interventions by the district court violated his right to confront his accusers. We review the district court's limitations on

cross-examination of a witness for an abuse of discretion and we will reverse "only if any error affected the substantial rights of the accused." United States v. Begay, 144 F.3d 1336, 1339 (10th Cir. 1998).

Defendant's right to cross-examine is not absolute or unlimited. United States v. Bindley, 157 F.3d 1235, 1240 (10th Cir. 1998). The district court has broad discretion to limit cross-examination in order to prevent, among other things, unfair prejudice, confusion, delay and presentation of cumulative evidence. See United States v. Gault, 141 F.3d 1399, 1403 (10th Cir. 1998); Miranda v. Cooper, 967 F.2d 392, 402 (10th Cir. 1992). The crucial question is "whether the jury had sufficient information to make a discriminating appraisal of the witness' motives and bias." Bindley, 157 F.3d at 1240.

The district court's intervention during defense counsel's cross-examination of both Seabury and Lucas occurred only after the same basic question had been asked and answered numerous times. No new information would have resulted from asking the same questions yet again. Moreover, our review of defense counsel's cross-examination of both Seabury and Lucas reveals that he more than adequately brought out the agreements each had with the prosecutor and the alleged perverse motives and bias each might have had as a result. The jury, therefore, had enough information with which to judge the

motive and bias of each witness.  Accordingly, we conclude that the district court did not abuse its discretion in this matter.

**B. Evidentiary Issues**

Defendant claims that the district court erred in admitting into evidence a photograph taken while Defendant was incarcerated (the "CCA Photograph") and a journal entry of a conviction for possession of crack cocaine in June 1997.  We review a trial court's decision to admit evidence for an abuse of discretion.  United States v. McVeigh, 153 F.3d 1166, 1188 (10th Cir. 1998).

**1. CCA Photograph**

As indicated above, the CCA Photograph shows Defendant in the middle of six other people, all of whom are dressed in prison garb and at least one of whom was identified as a drug offender by Ron Espy.  The handwritten caption reads "I keep a Firm no matter where I'm at, baby."  Defendant raises two claims of error as to the admission of the CCA Photograph.  First, he contends that the handwritten caption on the CCA Photograph was not properly authenticated and should not have been admitted.

At trial, Espy, a lay witness with respect to handwriting analysis, testified that the handwritten caption appeared to match the handwriting in Defendant's

letters to Moore. A lay witness may opine as to the genuineness of handwriting if that opinion is based on a familiarity with the handwriting that was acquired other than for purposes of the litigation. Fed. R. Evid. 901(b)(2). There is nothing in the record indicating that Espy was familiar with Defendant's handwriting outside of his preparation for the instant case; thus Espy's purported authentication is questionable under Rule 901(b)(2).

However, the rules provide for other means of authentication. The "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," can be used to authenticate the handwritten caption. Fed. R. Evid. 901(b)(4). Authentication under Rule 901(b)(4) is proper if the appearance, contents, distinctive characteristics and circumstances of discovery of the CCA Photograph "support a finding that the matter in question is what its proponent claims." United States v. Gutierrez, 576 F.2d 269, 275 (10th Cir. 1978).

The evidence supporting a finding that the handwritten caption was a statement of Defendant includes the following: (1) Defendant is prominently depicted in the CCA Photograph; (2) the caption referred to "The Firm," a term three government witnesses said was used by Defendant as a name for his drug distribution organization; (3) the CCA Photograph was found in a letter from Defendant to Natasha Moore, his girlfriend; and (4) the CCA Photograph was

discovered in the master bedroom of Moore's home along with other letters from Defendant to Moore. These facts provided the district court with an adequate basis for finding that the caption was what the government claimed it to be–a statement written by Defendant. As a result, admission was proper under Rule 901(b)(4).

Defendant also challenges the admission of the CCA Photograph under Fed. R. Evid. 403, claiming that a picture depicting him in prison garb was highly prejudicial and that the probativeness of the reference in the caption to "The Firm" was slight since three witnesses had already testified as to its existence. We agree that showing the jury a picture of a defendant in prison clothing may be highly prejudicial in some cases. But, any prejudice to Defendant in this case was mitigated by the fact that the jury was fully aware from other evidence that Defendant was incarcerated prior to his trial. Moreover, the CCA Photograph was highly probative. The caption's reference to "The Firm" corroborated the disputed testimony of three key government witnesses.

Because a sufficient basis for authenticating the handwritten caption exists and no basis for exclusion under Rule 403 has been demonstrated, we conclude that the district court did not abuse its discretion by admitting the CCA Photograph.

## 2. Past Conviction

At trial, the government introduced a journal entry of Defendant's June, 1997, conviction for possession of crack as evidence of the alleged Seabury Conspiracy. Defendant argues that the evidence of this conviction should be excluded under Fed. R. Evid. 404(b) and under Huddleston v. United States, 485 U.S. 681 (1988), on the grounds that it was more prejudicial than probative and conveyed to the jury only Defendant's propensity to commit crime.

Rule 404(b) "does not apply to other act evidence that is intrinsic to the crime charged." United States v. O'Brien, 131 F.3d 1428, 1432 (10th Cir. 1997). With respect to conspiracies, the Eighth Circuit has stated, and we agree, that "[a]ny drug activity by a conspirator during the conspiracy is relevant evidence of the existence of the conspiracy." United States v. Roulette, 75 F.3d 418, 424 (8th Cir. 1996). In other words, drug activity that occurs during the period of an alleged drug conspiracy may be relevant evidence of that conspiracy and thus not Rule 404(b) evidence. Here, that was the case.

Defendant was arrested and convicted for possession of crack cocaine during the period of the Seabury Conspiracy. That conviction is not unrelated to the instant case as Defendant claims. Rather, it provides direct evidence of the existence of the Seabury Conspiracy because it shows that Defendant, as one would expect of a person involved in a crack distribution conspiracy, had crack

cocaine in his possession. His conviction for possession is, therefore, direct evidence of the alleged conspiracy to distribute crack and not Rule 404(b) evidence. Accordingly, we hold that the district court did not abuse its discretion by admitting evidence of that conviction.

**C. Alleged Prosecutorial Misconduct**

In his closing argument, the prosecutor made the following statement: "It's your country, it's your community, it's your decision. You folks are the ones that have to make that decision here." R. Vol. V at 315. Defendant argues that this statement was an impermissible attempt to inflame the jury and incite societal alarm, and constituted reversible error. Because Defendant failed to object to the statement at trial, we review only for plain error. United States v. Lonedog, 929 F.2d 568, 570 (10th Cir. 1991).

After reviewing the statement in context, we agree with the government that it was intended only to emphasize the jury's responsibility in deciding the case. The prosecutor's inclusion of that statement in his closing argument, therefore, did not amount to plain error with respect to Defendant's right to a fair trial.

**D. Cumulative Effect of Errors on Defendant's Right to a Fair Trial**

We need not engage in a cumulative error analysis as requested by Defendant. When reviewing a case for cumulative error, only actual errors are considered in determining whether the defendant's right to a fair trial was violated. See United States v. Rivera, 900 F.2d 1462, 1470-71 (10th Cir. 1990) (en banc). Because we have found no errors, harmless or otherwise, resulting from the alleged judicial and prosecutorial misconduct and disputed evidentiary rulings, the cumulative error doctrine does not apply.

**E. Sufficiency of the Evidence**

Defendant next claims that the evidence was insufficient to support his conviction. We review the record de novo, "and ask only whether taking the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." United States v. Hanzlicek, 187 F.3d 1228, 1239 (10th Cir. 1999) (quotation omitted).

In order to prove a conspiracy beyond reasonable doubt, the government "must show (1) that two or more persons agreed to violate the law, (2) that the Defendant knew at least the essential objectives of the conspiracy, . . . (3) that the Defendant knowingly and voluntarily became a part of it, and (4) that the alleged

co-conspirators were interdependent." United States v. Ivy, 83 F.3d 1266, 1285 (10th Cir. 1996) (quotations omitted). The defendant must be generally aware of his co-conspirators, but need not know all of the co-conspirators or all the details of the conspiracy. United States v. Horn, 946 F.2d 738, 741 (10th Cir. 1991). Knowing participation in a conspiracy may be presumed when it is shown that the defendant acted in furtherance of the objective of the conspiracy. United States v. Brown, 995 F.2d 1493, 1502 (10th Cir. 1993).

The conduct of the co-conspirators must be interdependent in some way for a conspiracy to be shown. Horn, 946 F.2d at 740. "[I]f the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole, evidence of interdependence is present." Id. at 740-41.

After reviewing the record, we conclude that the evidence, outlined above, is clearly sufficient to support the verdict as to each element–including interdependence, the element with respect to which the Defendant directs most of his argument.

As to the element of interdependence, Defendant argues that the evidence merely shows that he and Seabury went together to buy drugs. Appellant's Br. at 28. As indicated above, however, Defendant's actions made the joint crack purchases from the Topeka seller possible. Thus, Defendant facilitated Seabury's

endeavors and the object of the Seabury conspiracy as a whole to possess and distribute crack. That is enough to show interdependence between Defendant and Seabury. See Horn, 946 F.2d at 740-41.

Defendant argues that his only relationship with Jones was that of buyer-seller and that interdependence does not exist in buyer-seller relationships. See United States v. Fox, 902 F.2d 1508, 1514 (10th Cir. 1990) ("[p]roof of the existence of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy.") (quotation omitted). However, the buyer-seller rule does not trump the general rule that interdependence exists where "each co-conspirator's activities constituted essential and integral steps toward the realization of a common, illicit goal." Id. (quotation omitted). The very purpose of the buyer-seller rule "is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors, who do intend to redistribute drugs for profit, thereby furthering the objective of the conspiracy." Ivy, 83 F.3d at 1285-86.

The buyer-seller rule does not apply here. The evidence establishes that Jones was not the end user of the crack he bought from Defendant. Jones purchased the crack for "Beedy-bump" and received a $200 commission from him for each completed purchase. Jones, therefore, was just another link in the distribution chain who shared Defendant's distribution objective. Defendant's

procurement and sale of crack to Jones facilitated the Jones' distribution endeavors and the distribution objective of the Jones conspiracy as a whole. That is sufficient to prove interdependence between Defendant and Jones.

Because we conclude that the evidence provided a sufficient basis from which a reasonable jury could find Defendant guilty beyond a reasonable doubt, it follows that the district court did not err in denying his motion for acquittal.

## F. Sentencing

At sentencing, the district court found that the government had demonstrated that the substance involved in the conspiracies was crack cocaine. As a result, the court determined Defendant's base offense level to be a 36 under U.S.S.G. §2D1.1(c). The district court also found that Defendant "organized and led a criminal enterprise." R. Vol. VI at 24. Accordingly, the court increased Defendant's base offense level by four levels pursuant to U.S.S.G. §3B1.1(a). Defendant contends that the district court erred in both matters because the evidence did not adequately prove that the substance involved in the conspiracies was crack or that he was an organizer or leader. We review the district court's factual findings for clear error and its overall application of the guidelines de novo. United States v. Cantley, 130 F.3d 1371, 1378 (10th Cir. 1997).

## 1. Crack Cocaine Enhancement

The 100:1 crack cocaine enhancement refers to the fact that under U.S.S.G. §2D1.1(c)(2), Defendant's base offense level of 36 for committing an offense involving .5 to 1.5 kilograms of crack is the same as the base offense level for committing an offense involving 50 to 150 kilograms of "regular" cocaine.

The evidence offered by the government need only prove the enhancement factor by a preponderance of the evidence. United States v. Beaulieu, 893 F.2d 1177, 1181 n.7 (10th Cir. 1990). The district court may consider relevant information not admissible at trial "so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability." United States v. Wacker, 72 F.3d 1453, 1477 (10th Cir. 1995) (quotations omitted); see also, U.S.S.G. §2D1.1, comment. (n.12).

At sentencing, the district court noted that even though Seabury and Jones did not use crack, they were both very familiar with it and both confident that the substance involved was crack. They stated that it was bought, packaged and sold as crack. The court also relied on Defendant's conviction for possession of crack in June 1997. Lastly, on October 2, 1997, police found 156 grams of crack at Defendant's residence. The district court was entitled to take that fact into consideration even though the evidence was inadmissible at trial. See Wacker, 72 F.3d at 1477. After reviewing the record, we conclude that the court did not err

in finding that the substance involved in the charged conspiracies was crack cocaine.

## 2. Organizer/Leader Enhancement

U.S.S.G. §3B1.1(a) provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels." Factors to be considered in evaluating whether or not Defendant is a leader or organizer include:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. §3B1.1(a) comment. (n.4). The guidelines do not require that all of these factors be present for the enhancement to apply. United States v. Bernaugh, 969 F.2d 858, 863 (10th Cir. 1992). The government must prove that the defendant was either a leader or an organizer by a preponderance of the evidence. See United States v. Torres, 53 F.3d 1129, 1142 (10th Cir. 1995).

An organizer under §3B1.1(a) is someone who is "responsible for organizing others for the purpose of carrying out the crime." Bernaugh, 969 F.2d at 862-63 (quotation omitted). The government does not need to show that

Defendant exercised control over other participants in order to prove that he was an organizer. United States v. Valdez-Arieta, 127 F.3d 1267, 1272 (10th Cir. 1997). In order to be classified as a leader under §3B1.1(a), Defendant must have exercised some control over at least one person involved in a criminal activity involving five or more people. United States v. Cruz Camacho, 137 F.3d 1220, 1224 (10th Cir. 1998); Bernaugh, 969 F.2d at 862.

The evidence shows that at least Defendant, Seabury, Jones, Lucas, Tamika Moore, Lakeisha Green, Jermaine Archibald and Louisa Seabury (Seabury's mother) were involved in a common criminal activity. Thus, the five or more persons requirement is met.

Defendant was an organizer of criminal activity. At a minimum, the evidence shows that Defendant recruited Lucas to hold his drug proceeds and Jones to purchase crack from him. Defendant also organized drug purchases and sales. He arranged the joint purchases from the Topeka seller for himself and Seabury. As Jones' supplier, he had to arrange for sales to Jones and obtain adequate inventory. In addition, because the evidence indicates that Defendant had others selling crack for him, we can presume that he had to supply them with crack and possibly define territories and set selling prices and commissions.

Defendant can also be deemed a leader in this drug organization because the evidence supports a finding of control. It is clear that Defendant exercised

-23-

control over Lucas. He directed her to hold money for him and was able to retrieve it when he wanted. He had to exert some control to ensure that Lucas would not spend his money. Defendant had to exert some control over the people who sold his drugs for him, or they could abscond with the proceeds. In addition, the transcript[4] of Tamika Moore's grand jury testimony admitted at sentencing shows that Defendant directed her to hide 156 grams of crack in his Ogden, Kansas, home. Defendant's instruction together with Tamika Moore's compliance shows that he exerted control over her.

After reviewing the record and the transcript of the sentencing hearing, we hold that the district court did not err in finding that Defendant was both an organizer and a leader of a criminal activity involving five or more persons or in applying the organizer/leader enhancement to Defendant.

---

[4]Defendant objects to the admission of the transcript at sentencing on the theory that since the search which revealed the cocaine was found to be improper and the evidence resulting therefrom was suppressed at trial, nothing connected to that search should be admissible at sentencing. However, we have held that the exclusionary rule generally does not apply at sentencing so long as there is no indication that the evidence was illegally obtained for the purpose of increasing a defendant's sentence. United States v. Jessup, 966 F.2d 1354, 1356-57 (10th Cir. 1992). Because there was no indication that the search was conducted in order to increase Defendant's sentence, the transcript of Tamika Moore's grand jury testimony was properly considered by the district court at sentencing.

### III. CONCLUSION

For the reasons stated above, Defendant's conviction and sentence are AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge